# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP2107-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>    Plaintiff-Respondent-Petitioner,<br>  v.<br>Dean M. Blatterman,<br>    Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 354 Wis. 2d 325, 847 N.W.2d 427)
(Ct. App. - Unpublished)

| | |
|---|---|
| OPINION FILED: | May 5, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 4, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dane |
|   JUDGE: | William E. Hanrahan |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ZIEGLER, J., ROGGENSACK, C.J. (joining section II) and PROSSER, J. |
|   DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *David H. Perlman*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.



For the defendant-appellant, there was a brief by *Marcus J. Berghahn* and *Hurley, Burish & Stanton, S.C.*, Madison, and *Jonas B. Bednarek* and *Bednarek Law Office, S.C.*, Madison. Oral argument by *Jonas B. Bednarek*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP2107-CR
(L.C. No. 2013CT418)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent-Petitioner,

    v.

Dean M. Blatterman,

      Defendant-Appellant.

**FILED**

**MAY 5, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review a decision of the court of appeals[1] that reversed the circuit court's[2] ruling that admitted test results from a blood draw conducted after police transported Dean M. Blatterman to a hospital. Officers conducted an investigatory stop of Blatterman's vehicle that was grounded in a call from Blatterman's wife. Police were concerned with possible carbon monoxide poisoning and possible

_____

[1] State v. Blatterman, No. 2013AP2107-CR, unpublished slip op. (Wis. Ct. App. Apr. 24, 2014).

[2] The Honorable William E. Hanrahan of Dane County presiding.

intoxication when they stopped him. After being stopped, Blatterman did not comply with police orders. Also, he complained of chest pain. Based on their observations and his wife's concerns, police transported Blatterman to a hospital for medical assessment and then conducted a legal blood draw. In addition, before transport, an officer checked Blatterman's driving record and learned that he had three prior operating while intoxicated (OWI) convictions. This reduced his threshold for a prohibited alcohol concentration[3] (PAC) from 0.08% to 0.02%.[4] Results of the blood test demonstrated Blatterman had operated his vehicle with a PAC.

¶2 We conclude that Blatterman's stop and detention satisfied the reasonableness requirement of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution because they were supported by reasonable suspicion to conduct an investigatory detention. Blatterman's arrest, which occurred when Deputy James Nisius transported Blatterman to the hospital, satisfied the

---

[3] Wisconsin Stat. § 340.01(1v) (2011-12) defines alcohol concentration relative to blood volume as "grams of alcohol per 100 milliliters of a person's blood." All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[4] Wisconsin Stat. § 340.01(46m)(c) defines prohibited alcohol concentration as "an alcohol concentration of more than 0.02" for persons who have three or more "prior convictions, suspensions or revocations, as counted under s. 343.307(1)." There is no dispute that Blatterman was subject to the .02 PAC standard under § 340.01(46m)(c).

reasonableness requirement of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution because Deputy Nisius then had probable cause to arrest Blatterman. Furthermore, the transportation to the hospital was lawful as a community caretaker function of law enforcement. Accordingly, we reverse the court of appeals decision[5] that reversed the circuit court's denial of Blatterman's motion to suppress.

## I.  BACKGROUND

¶3  On March 19, 2013, Deputy Nisius of the Dane County Sheriff's Department and several other officers received a dispatch that advised Nisius and the other officers that it had been reported to law enforcement that Blatterman was bringing gas into his house through a stove or fireplace to try to blow up the house or light it on fire. The complainant was Blatterman's wife. While Nisius was responding to the call, dispatch updated Nisius that Blatterman was leaving the house in a white minivan, with a specific license plate number. Dispatch informed Nisius that Blatterman was possibly intoxicated and had, in the past, mentioned "suicide by cop."

¶4  Soon thereafter, Nisius observed Blatterman's white minivan approaching him. Nisius allowed the minivan to pass him, made a U-turn, and followed Blatterman.

---

[5] _Blatterman_, No. 2013AP2107-CR, unpublished slip op., ¶34.

¶5 Blatterman did not violate any traffic laws. Nisius did not immediately stop the van because Blatterman may have been intoxicated, allegedly tried to ignite his house, and had previously mentioned suicide by cop. Instead, he contacted other officers in order to conduct a high-risk stop.[6]

¶6 When other officers arrived, Nisius turned on his red and blue lights and the van pulled over. Other officers pulled up next to Nisius's vehicle on each side, bringing the total number of officers involved and squad cars present to three. The back-up officers opened their doors, drew their weapons, and pointed them at the van. Nisius directed Blatterman to turn off the vehicle, to open the driver's side window, and to put his hands outside.

¶7 Instead, Blatterman immediately opened the driver's side door and began walking toward the officers with his hands in the air. Blatterman's actions were contrary to the instructions yelled by all of the officers. One of the back-up officers transitioned from his duty weapon to a Taser, and told Blatterman that he would use the Taser on him if he did not stop walking. Blatterman stopped, approximately six to eight feet away from the bumper of Nisius's squad car. A back-up officer instructed Blatterman to turn away and get down onto the ground. Blatterman did not turn away, but did kneel down. Two back-up

---

[6] High risk stops involve officers stopping a vehicle in a safe manner when someone in the vehicle may present harm to himself, others, or involved officers.

4

officers forced Blatterman to the ground. Nisius handcuffed Blatterman and searched him for weapons. After the search, Nisius asked if Blatterman was okay. Blatterman said that his chest hurt, and the officers requested emergency medical services (EMS).

¶8 Blatterman was wearing only a short-sleeve shirt and jeans with boots despite the cold weather at the time of the stop. Nisius smelled alcohol on Blatterman and noticed his eyes were watery. The officers placed Blatterman in the back of Nisius's squad car because it was "freezing" outside. The back doors of the squad car did not open from the inside. EMS arrived several minutes later, but Blatterman refused medical attention.

¶9 Nisius considered Blatterman's possible carbon monoxide poisoning, his chest pain, that he was potentially suicidal, and decided Blatterman "should get checked out at the hospital." Nisius asked Blatterman what hospital he wanted to go to and Blatterman responded that his doctor was associated with St. Mary's. After EMS was finished and before Blatterman was moved from the scene of the stop, Nisius checked Blatterman's driving record. He found that Blatterman had three prior OWI convictions.[7] Nisius also was concerned that

_____

[7] Nisius testified "That [Blatterman] had two prior or three prior convictions for OWI." The circuit court found that when Nisius ran Blatterman's driving record, he found three prior OWI convictions. We uphold the circuit court's findings of fact unless they are clearly erroneous. State v. Pinkard, 2010 WI 81, ¶12, 327 Wis. 2d 346, 785 N.W.2d 592.

Blatterman was intoxicated because of "his strange behavior by not responding to officers who are pointing weapons on you or at you," the odor of alcohol, watery eyes, and information from dispatch that he may be intoxicated.

¶10 Nisius took Blatterman to St. Mary's, which was approximately ten miles from the scene of the stop. He informed the staff that his reasons for bringing Blatterman to the hospital were physical and psychological medical concerns, and that he would "potentially [have] a need for a phlebotomist to do a legal blood draw." While Blatterman remained handcuffed, St. Mary's staff examined him for potential carbon monoxide poisoning and chest pain and did not find any medical concern. The assessment included questions about whether Blatterman was suicidal. Blatterman denied being suicidal and claimed his wife was just trying to get him in trouble.

¶11 After the medical assessment was completed, Nisius removed Blatterman's handcuffs and had him perform field sobriety tests in the exam room. Hospital staff drew Blatterman's blood. The test of Blatterman's blood sample showed his blood alcohol concentration was 0.118%, well over the threshold of 0.02% for the PAC imposed by his prior OWI convictions.

¶12 Blatterman was charged with OWI, fourth offense, in violation of Wis. Stat. § 346.63(1)(a) and Wis. Stat. § 346.65(2)(am)(4). Blatterman also was charged with a PAC, fourth offense, in violation of § 346.63(1)(b) and § 346.65(2)(am)(4). Because this was Blatterman's fourth

6

offense under § 346.65(2)(am)(4) and Wis. Stat. § 939.60, the crime was a misdemeanor.

¶13 Blatterman moved for suppression of the blood test results, claiming that his transportation to the hospital amounted to an arrest unsupported by probable cause. The court considered whether the transport was within the vicinity under State v. Quartana, and whether Nisius's purpose in transporting Blatterman was reasonable. State v. Quartana, 213 Wis. 2d 440, 570 N.W.2d 618 (Ct. App. 1997). The court concluded ten miles was within the vicinity. See id. at 446-47. As for reasonable suspicion for the stop and transport, the court noted that dispatch said Blatterman was filling a house with gas, he possibly was intoxicated, and he had talked about suicide by cop in the past. The court noted that after stopping Blatterman, "there was nothing that the defendant did that would dispel the notion that it was—that it was safe for the officers to interact with the defendant," because Blatterman did not follow instructions. The court also noted that Blatterman's complaints of chest pain, his wearing a short-sleeve shirt without a jacket in cold weather, as well as Nisius's belief that Blatterman may have exposed himself to carbon monoxide supported transport to the hospital. The court concluded that the officer's actions were objectively reasonable. The circuit court denied Blatterman's motion to suppress the blood test results and he pled guilty to the OWI charge.

¶14 Blatterman appealed. The court of appeals focused primarily on whether transportation outside the vicinity of the

stop transformed the initial investigatory detention into a "de facto arrest" in violation of the Fourth Amendment. State v. Blatterman, No. 2013AP2107-CR, unpublished slip op., ¶18 (Wis. Ct. App. Apr. 24, 2014). The court of appeals held that Blatterman's transportation to the hospital was not within the vicinity, exceeded the scope of investigatory detention, and violated Blatterman's Fourth Amendment rights. Id., ¶¶27, 33.

¶15 The State petitioned for review, which we granted.

## II. DISCUSSION

### A. Standard of Review

¶16 We review the circuit court's denial of Blatterman's motion to suppress. When we review a decision on a motion to suppress evidence, we uphold a circuit court's findings of historical fact unless they are clearly erroneous. State v. Pinkard, 2010 WI 81, ¶12, 327 Wis. 2d 346, 785 N.W.2d 592. However, we review the application of constitutional principles to those facts independently, as questions of law. Id. Accordingly, whether there was probable cause for arrest or whether an officer's community caretaker function satisfies the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions are questions for our independent review. Village of Elkhart Lake v. Borzyskowski, 123 Wis. 2d 185, 189, 366 N.W.2d 506 (Ct. App. 1985); State v. Kramer, 2009 WI 14, ¶16, 315 Wis. 2d 414, 759 N.W.2d 598.

### B. Investigatory Detention

¶17 We assume without deciding that there was not sufficient evidence to support probable cause to arrest

8

Blatterman when the officers stopped his vehicle. However, the officers' temporary investigative stop was a seizure within the meaning of the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions. See State v. Arias, 2008 WI 84, ¶29, 311 Wis. 2d 358, 752 N.W.2d 748; State v. Williams, 2001 WI 21, ¶18, 241 Wis. 2d 631, 623 N.W.2d 106. Accordingly, the State bears the burden of proving that the seizure complied with the Fourth Amendment and Article I, Section 11. See State v. Harris, 206 Wis. 2d 243, 263, 557 N.W.2d 245 (1996).

¶18 Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), a police officer may, under certain circumstances, temporarily detain a person for purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest. Id. at 22; State v. Chambers, 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972). The Wisconsin Legislature codified the Terry constitutional standard in Wis. Stat. § 968.24. When we interpret § 968.24, we rely on Terry and the cases following it. State v. Jackson, 147 Wis. 2d 824, 830-31, 434 N.W.2d 386 (1989).

¶19 According to Wis. Stat. § 968.24, an officer may conduct a temporary investigatory detention when "the officer reasonably suspects that [a] person is committing . . . a crime." § 968.24. Here, dispatch informed the officers that according to Blatterman's wife, Blatterman had attempted to blow up their home by drawing gas into the house and that he may be intoxicated. The officers reasonably suspected that Blatterman

had committed a crime. Accordingly, § 968.24 authorized the officers to temporarily detain Blatterman for questioning.

¶20 Working from our conclusion that the officers' temporary detention of Blatterman was supported by reasonable suspicion, we next consider whether the length of the stop was reasonable. See Florida v. Royer, 460 U.S. 491, 499 (1983) (stating that unreasonably prolonged detentions may violate the Fourth Amendment absent probable cause). We must "guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires." Terry, 392 U.S. at 15. "[T]he police [may not] seek to verify their suspicions by means that approach the conditions of arrest." Royer, 460 U.S. at 499. Consequently, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Id. at 500.

¶21 In determining whether the length of a stop is permissible, it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [person]." United States v. Sharpe, 470 U.S. 675, 686 (1985). "In making this assessment, courts should not indulge in unrealistic second-guessing. In assessing a detention's validity, courts must consider the totality of the circumstances——the whole picture, because the concept of reasonable suspicion is not readily, or even usefully, reduced to a neat set of legal rules." State v. Wilkens, 159 Wis. 2d

10

618, 626, 465 N.W.2d 206 (Ct. App. 1990) (internal quotation marks and citations omitted).

¶22 In the instant case, the duration of Blatterman's stop was reasonable. Nisius diligently pursued his investigation. He called an officer at Blatterman's residence for further information; he checked Blatterman's driving record; and he interacted with Blatterman due to what appeared to be an emerging medical concern. He also sought medical attention for Blatterman and waited for EMS and EMS's interaction with Blatterman. Medical attention is a valid reason to extend an investigatory detention. State v. Colstad, 2003 WI App 25, ¶17, 260 Wis. 2d 406, 659 N.W.2d 394.

¶23 In Colstad, a chaotic accident scene required the attention of the police officer who stopped Colstad. Id. Colstad had to wait 30 to 45 minutes for questioning to resume. Id. The court of appeals held the length of detention was reasonable and noted that the officer spent considerable time providing medical assistance to the accident victim and investigating the scene. Id. Similarly, here, time spent waiting for and attempting to provide medical assistance to Blatterman did not cause the length of the stop to become unreasonable.

¶24 Blatterman's stop and detention were supported by reasonable suspicion and lasted a reasonable length of time. We next consider whether Nisius's transportation of Blatterman was within the vicinity of the stop and therefore, within the scope of an investigatory detention. Quartana, 213 Wis. 2d at 446.

11

We also note that the express language of Wis. Stat. § 968.24, provided in full below,[8] authorizes police to question a suspect "in the vicinity where the person was stopped" during the course of an investigatory detention. The police may, where reasonable grounds exist, "move a suspect in the general vicinity of the stop without converting what would otherwise be a temporary seizure into an arrest." Id. Therefore, when a person who is temporarily detained for investigation pursuant to a Terry stop and is then moved to another location, courts conduct a two-part inquiry: "First, was the person moved within the 'vicinity' [of the stop]? Second, was the purpose in moving the person within the vicinity reasonable?" Id.

¶25 In Quartana, the court of appeals referred to a dictionary to define "vicinity" to mean "a surrounding area or district" or "locality." Id. (quoting Webster's Third New International Dictionary: Unabridged 2550 (1976)). The court concluded that the officer's transportation of Quartana between his house and the accident scene one mile away was within the

---

[8] Wis. Stat. § 968.24 provides:

Temporary questioning without arrest. After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

12

"surrounding area" or "locality." Id. at 447. The court noted that the accident scene was within walking distance of the home, even in the winter, and that Quartana had initially walked from the scene to his home. Id. at 444, 447.

¶26 In the case now before us, Nisius transported Blatterman from where he was stopped to a hospital ten miles away. We conclude that ten miles is too distant a transportation to be within the vicinity so long as the temporary detention is supported by no more than a reasonable suspicion.[9] A transportation of ten miles from the place of the stop is not within "a surrounding area or district," or the "locality." See id. at 446 (quoting Webster's Third New International Dictionary: Unabridged 2550). We decline to determine the precise outer limits of the "vicinity" for purposes of transportation during an investigatory detention.

¶27 Unpublished cases interpreting Quartana, while not precedential, support our interpretation that the vicinity is less than a ten-mile distance. See State v. Burton, No. 2009AP180, unpublished slip op., ¶¶14-15 (Wis. Ct. App. Sept. 23, 2009) (concluding officer's transport of defendant eight miles from accident scene to hospital to continue OWI investigation, while handcuffed, was not within the vicinity);

---

[9] The circuit court concluded that ten miles was within the vicinity. While the circuit court characterized this conclusion as a finding of fact, we conclude that it was a conclusion of law, which we review independently. Pinkard, 327 Wis. 2d 346, ¶12.

State v. Doyle, No. 2010AP2466-CR, unpublished slip op., ¶13 (Wis. Ct. App. Sept. 22, 2011) (concluding that four mile transportation was "at the outer limits of the definition of 'vicinity'").

¶28 Since Nisius transported Blatterman beyond the vicinity of the original stop, we need not inquire whether Nisius's purpose in moving Blatterman was reasonable.[10] See Quartana, 213 Wis. 2d at 446. Furthermore, because transporting Blatterman to the hospital was not in the vicinity of the Terry stop, in order to be lawful, it must have been supported by probable cause to arrest or by a reasonable exercise of the community caretaker function.[11]

### C.  Probable Cause to Arrest

¶29 Given our conclusion that Blatterman's transportation was outside the scope of a temporary investigatory detention, our next inquiry is whether Nisius's transportation of Blatterman was supported by probable cause to arrest. It is necessary to determine when the arrest occurred because "[p]robable cause to arrest . . . refers to that quantum of evidence within the arresting officer's knowledge at the time of

---

[10] We note that the parties' arguments seem to assume that there was a hospital that was closer than ten miles from the location of the traffic stop in which to address Blatterman's emerging medical issues.

[11] We do not address a circumstance wherein exigent circumstances would bear on the reasonableness of a defendant's transportation during a Terry stop.

14

the arrest that would lead a reasonable law enforcement officer to believe that the defendant was operating a motor vehicle [at a prohibited alcohol concentration]."[12]  State v. Lange, 2009 WI 49, ¶19, 317 Wis. 2d 383, 766 N.W.2d 551.

### 1.  Timing of arrest

¶30  In Wisconsin, the test for whether a person has been arrested is whether a "reasonable person in the defendant's position would have considered himself or herself to be 'in custody,' given the degree of restraint under the circumstances."  State v. Swanson, 164 Wis. 2d 437, 447, 475 N.W.2d 148 (1991), abrogated on other grounds by State v. Sykes, 2005 WI 48, 279 Wis. 2d 742, 695 N.W.2d 277.  "The circumstances of the situation including what has been communicated by the police officers, either by their words or actions, shall be controlling under the objective test."  Id.

¶31  Blatterman argues that his transportation to the hospital while handcuffed amounted to an arrest.  Although the use of handcuffs is certainly restrictive, it "does not necessarily render a temporary detention unreasonable [or transform a] detention into an arrest."  State v. Pickens, 2010 WI App 5, ¶32, 323 Wis. 2d 226, 779 N.W.2d 1.  However, for such measures to be reasonable, they must be justified by particular

---

[12] State v. Lange, 2009 WI 49, 317 Wis. 2d 383, 766 N.W.2d 551, is grounded in "operating while under the influence of an intoxicant."  Id., ¶19.  Blatterman was arrested for both OWI and PAC.  Our probable cause analysis focuses on the PAC violation.

circumstances, such as the risk of harm to the officers. See State v. Vorburger, 2002 WI 105, ¶65, 255 Wis. 2d 537, 648 N.W.2d 829.

¶32 Here, Blatterman repeatedly failed to follow the officers' instructions, and dispatch informed the officers that Blatterman had mentioned suicide by cop, causing concern that their interactions with him could escalate into a violent confrontation. Therefore, the use of handcuffs and detention in the squad car are not sufficient to transform Blatterman's investigatory detention into an arrest. Furthermore, even though the officers approached Blatterman at gunpoint, this did not transform the investigatory stop into an arrest. Jones v. State, 70 Wis. 2d 62, 70, 233 N.W.2d 441 (1975) (explaining that an officer drawing a weapon during a Terry stop does not transform the stop into an arrest).

¶33 Though Blatterman's handcuffing and detention alone did not transform his temporary investigatory detention into an arrest, we conclude Blatterman was arrested at the time of his transportation to the hospital. Upon transportation, a reasonable person in Blatterman's position would have believed that he was in custody due to an arrest because his transportation was involuntary, and he had experienced a significant level of force and restraint since the initial stop. See Vorburger, 255 Wis. 2d 537, ¶68 (concluding that "we use an objective test, assessing the totality of the circumstances, to determine whether a seizure has escalated into an arrest"); State v. Burton, No. 2009AP180, unpublished slip op., ¶19 (Wis.

16

Ct. App. Sept. 23, 2009) (concluding "[a] reasonable person would [understand] that the level of restraint, duration of custody, and diminishing potential for release amounted to a formal arrest").

### 2.  Probable cause

¶34 Warrantless arrests are unlawful unless they are supported by probable cause.[13]  Lange, 317 Wis. 2d 383, ¶19. "Probable cause to arrest . . . refers to that quantum of evidence within the arresting officer's knowledge at the time of the arrest that would lead a reasonable law enforcement officer to believe that the defendant was operating a motor vehicle [at a prohibited alcohol concentration]."  Id.  "The burden is on the state to show [it] had probable cause to arrest."  Id.

¶35 In determining whether probable cause exists, we examine the totality of the circumstances and consider whether the police officer had "facts and circumstances within his or her knowledge sufficient to warrant a reasonable person to conclude that the defendant . . . committed or [was] in the process of committing an offense."  State v. Richardson, 156 Wis. 2d 128, 148, 456 N.W.2d 830 (1990).  The probable cause requirement "deals with probabilities" and must be sufficient

---

[13] State v. Secrist, 224 Wis. 2d 201, 209, 212, 589 N.W.2d 387 (1999) ("Under both the Fourth Amendment and Article I, § 11 of the Wisconsin Constitution, probable cause must exist to justify an arrest. . . .  Probable cause is the sine qua non of a lawful arrest.") (internal quotation marks and citation omitted).

"to lead a reasonable officer to believe that guilt is more than a possibility." Borzyskowski, 123 Wis. 2d at 189; accord State v. Drogsvold, 104 Wis. 2d 247, 254, 311 N.W.2d 243 (Ct. App. 1981). This standard is case-specific: "[t]he quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case." State v. Paszek, 50 Wis. 2d 619, 625, 184 N.W.2d 836 (1971) (citing Wong Sun v. United States, 371 U.S. 471 (1963)).

¶36 Police may properly consider prior convictions in a probable cause determination. State v. Goss, 2011 WI 104, ¶24, 338 Wis. 2d 72, 806 N.W.2d 918 (evaluating probable cause to request a preliminary breath test); Lange, 317 Wis. 2d 383, ¶33 (evaluating probable cause to arrest). Prior convictions are especially relevant in this case because the statute reduced the PAC threshold applicable to Blatterman from 0.08% to 0.02% alcohol concentration. Goss, 338 Wis. 2d 72, ¶24; Wis. Stat. § 340.01(46m)(c) (defining PAC as more than 0.02% for individuals with three or more prior convictions).

¶37 Here, Nisius checked Blatterman's driving record, which showed three prior OWI convictions that lowered Blatterman's PAC threshold to 0.02%. Wis. Stat. § 340.01(46m)(c). Nisius observed Blatterman's repeated failure to follow the officers' orders. Nisius also knew, from dispatch, that Blatterman possibly was intoxicated. Once officers had restrained Blatterman, Nisius detected the odor of alcohol on Blatterman's person and observed his watery eyes.

¶38 By the time Nisius transported Blatterman to the hospital, Nisius had ascertained Blatterman's prior OWI conviction record and, together with information from dispatch and his own observations, had established probable cause to arrest Blatterman for a 0.02% PAC violation. Accordingly, Blatterman's arrest when he was transported to the hospital was lawful and did not violate his rights under the Fourth Amendment and Section I, Article 11 of the federal and state Constitutions. See Lange, 317 Wis. 2d 383, ¶19.

D. Community Caretaker Exception

¶39 The federal and state Constitutions protect persons against unreasonable seizures. Arias, 311 Wis. 2d 358, ¶13. We "have recognized that a police officer serving as a community caretaker to protect persons and property may be constitutionally permitted to perform" seizures without probable cause. Pinkard, 327 Wis. 2d 346, ¶14 (citing Cady v. Dombrowski, 413 U.S. 433, 448 (1973)); accord Kramer, 315 Wis. 2d 414, ¶18. A law enforcement officer exercises a community caretaker function, rather than a law enforcement function, when an "officer discovers a member of the public who is in need of assistance." Kramer, 315 Wis. 2d 414, ¶32. It is the State's burden to prove that the officer's conduct is a reasonable community caretaker function. Id., ¶17.

¶40 In the case before us, we discuss the applicability of the community caretaker exception as an alternative ground for the officer's transportation of Blatterman to the hospital, assuming arguendo, that the officer's arrest of Blatterman was

19

unsupported by probable cause. We "interpret the provisions of the Fourth Amendment and Article I, Section 11 as equivalent in regard to community caretaker analyses." Id., ¶18. Therefore, "we look to the United States Supreme Court's interpretation of the community caretaker exception." Pinkard, 327 Wis. 2d 346, ¶14 (citing Kramer, 315 Wis. 2d 414, ¶18).

¶41 The community caretaker exception has its origins in Cady. In Cady, Dombrowski's car was disabled by an accident and sitting on the side of a road. Cady, 413 U.S. at 435-36. The responding officers knew Dombrowski was a Chicago police officer and believed he was required to carry a service revolver at all times. Id. at 436. The officers conducted a warrantless search "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." Id. at 443. The Court upheld the warrantless search, providing the following rationale:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Id. at 441. Soon after, we first applied the community caretaker exception in Bies v. State, 76 Wis. 2d 457, 251 N.W.2d 461 (1977). In Bies, we noted that "[a]s a general matter [checking noise complaints] is probably more a part of the community caretaker function of the police which, while perhaps

20

lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role." Id. at 471.

¶42 In Kramer, we adopted a three-component test for evaluating potential community caretaker functions. Kramer, 315 Wis. 2d 414, ¶21. When the State asserts a community caretaker function as the basis for a seizure, the circuit court must determine: "(1) that a seizure within the meaning of the [F]ourth [A]mendment has occurred; (2) if so, whether the police conduct was [a] bona fide community caretaker [function]; and (3) if so, whether the public . . . interest outweigh[s] the intrusion [on] the privacy of the individual." Id. (quoting State v. Anderson, 142 Wis. 2d 162, 169, 417 N.W.2d 411 (Ct. App. 1987)). We now apply the Kramer test.

### 1.  Seizure

¶43 A seizure within the meaning of the Fourth Amendment occurred here. We assume for the purposes of this discussion that the officer did not have probable cause to arrest Blatterman at that time. See Vorburger, 255 Wis. 2d 537, ¶68. Accordingly, our discussion of the community caretaker exception focuses on whether the officer was exercising a community caretaker function at the time of Blatterman's transportation. However, as we explain further below, the officer began exercising his community caretaker function earlier in his interaction with Blatterman and therefore, our community caretaker analysis begins before Blatterman's transportation.

21

2. Bona fide community caretaker function

¶44 The second component in reviewing whether an officer was acting as a community caretaker requires the officer to be engaged in a bona fide community caretaker function if the officer's conduct is to be upheld. Kramer, 315 Wis. 2d 414, ¶23 (citing State v. Kelsey C.R., 2001 WI 54, ¶35, 243 Wis. 2d 422, 626 N.W.2d 777). In evaluating this component, we examine the totality of the circumstances as they existed at the time of the police conduct. Id., ¶30 (citing Cady, 413 U.S. at 440). We have rejected the contention that community caretaker functions must be totally independent from the detection, investigation, or acquisition of evidence relating to the commission of a crime. Id. Rather, we have concluded that "in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." Id.

¶45 Here, we conclude that the officer was engaged in a bona fide community caretaker function. The officer began to exercise his community caretaking function shortly after he stopped Blatterman's vehicle. Our conclusion is based on the circuit court's findings of fact[14] that dispatch informed the officer that Blatterman attempted to blow up his house by

---

[14] The circuit court did not decide whether Blatterman's transport to the hospital was undertaken as a community caretaker function, but the court did find that the officer's medical concern for Blatterman was justified.

22

filling it with gas, that Blatterman may be intoxicated, and that Blatterman had, in the past, talked of suicide by cop.[15] The circuit court also found that Blatterman exhibited erratic and disoriented behavior, he complained of chest pain, and he was wearing only a short-sleeve shirt and jeans in very cold weather.

¶46 The officer kept Blatterman handcuffed, placed him in the back of a squad car, called EMS, and transported Blatterman to the hospital after he refused EMS attention. The handcuffs kept Blatterman from hurting himself or others if concerns about his mental state were correct. Placing Blatterman in the back of a squad car kept him out of the cold weather. Calling EMS to assess his medical condition and transporting him to the hospital also addressed the officer's concerns about Blatterman's possible carbon monoxide poisoning, his self-reported chest pain, his possible alcohol use, and his mental health. The totality of circumstances demonstrates that the officer's actions were undertaken as community caretaker

---

[15] Wisconsin's emergency detention statute, Wis. Stat. § 51.15, authorizes police officers to take an individual into custody if they have "cause to believe that the individual is mentally ill" and if that individual has demonstrated "[a] substantial probability of physical harm to himself or herself" or "[a] substantial probability of physical harm to other persons." § 51.15(1)1.-2. Though neither party addressed this statute, it is worth noting that according to Horngren, police action pursuant to § 51.15 is a community caretaker function. State v. Horngren, 2000 WI App 177, ¶11, 238 Wis. 2d 347, 617 N.W.2d 508.

23

functions, directly related to concern for Blatterman's physical and mental health. See Kramer, 315 Wis. 2d 414, ¶30.

¶47 We conclude that although Nisius held subjective law enforcement concerns, as we have explained above, those subjective concerns did not negate the objectively reasonable basis for a community caretaker function. Id. Officers may base their actions simultaneously on law enforcement and community caretaker functions. We have repeatedly explained that officers are charged with both law enforcement and community caretaker functions as part of their service of the public. Pinkard, 327 Wis. 2d 346, ¶53; Kramer, 315 Wis. 2d 414, ¶32.

> As an officer goes about his or her duties, an officer cannot always ascertain which hat the officer will wear—his law enforcement hat or her community caretaker hat. . . . Accordingly, the officer may have law enforcement concerns, even when the officer has an objectively reasonable basis for performing a community caretaker function.
>
> To conclude otherwise would ignore the multifaceted nature of police work and force police officers to let down their guard and unnecessarily expose themselves to dangerous conditions.

Kramer, 315 Wis. 2d 414, ¶¶32-33. Accordingly, we conclude that the officer was engaged in a bona fide community caretaker function when he transported Blatterman to the hospital.

### 3. Reasonableness balance

¶48 We now consider the third component: "whether the officer's exercise of a bona fide community caretaker function was reasonable." Id., ¶40 (citing Kelsey C.R., 243 Wis. 2d 422,

24

¶35). We consider the third component by "balancing a public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen." Id. (citing Arias, 311 Wis. 2d 358, ¶32). "The stronger the public need and the more minimal the intrusion upon an individual's liberty, the more likely the police conduct will be held to be reasonable." Id., ¶41. We balance these interests by weighing four factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

Id. (quoting Kelsey C.R., 243 Wis. 2d 422, ¶36).

### a. public interest and exigency

¶49 The first factor is "the degree of the public interest and the exigency of the situation." Id. An individual's physical and mental health status is an issue of public interest and presents an exigency when an officer reasonably determines that physical or mental health could be in jeopardy. See Pinkard, 327 Wis. 2d 346, ¶¶47-48.

¶50 In Pinkard, officers entered a residence when two occupants were unconscious. Id., ¶5. In weighing public interest and exigency as a factor to determine whether exercise of the community caretaker function was reasonable, we considered the medical consequences of officers not exercising

25

the community caretaker function. Id., ¶¶47-48. "If Pinkard and his companion had been suffering from a cocaine overdose, a reasonable inference based on these facts, the officers were presented with a significant exigency, for every passing minute could have been the difference between life and death." Id., ¶47. Similarly, here, the officer reasonably inferred that Blatterman could have been suffering from carbon monoxide poisoning or other serious illness, given the information from dispatch that he had been exposed to some kind of gas and his own statement that he had chest pain.

¶51 In State v. Horngren, 2011 WI App 177, 238 Wis. 2d 347, 617 N.W.2d 508, officers entered a residence in response to a call that an individual there was threatening to commit suicide. Id., ¶2. When the court of appeals weighed public interest and exigency as a factor to determine whether exercise of the community caretaker function was reasonable, the court stated that "the public good involved preventing a suicide, and securing medical assistance for a troubled individual. . . . The exigency of such a situation is obvious." Id., ¶¶14-15.

¶52 In the case now before us, the officer knew of Blatterman's previous remarks about suicide by cop. Though the circumstances here differ from the threats of suicide in Horngren, nevertheless they evidence a similar public interest at stake and exigency presented to the officer. The public has a substantial interest in police ensuring the well-being and safety of citizens who may be suffering from health concerns that present exigencies. Accordingly, the first factor favors

the conclusion that the officer reasonably performed his community caretaker function.

b. attendant circumstances

¶53 In considering the second factor, whether the time, location, and degree of authority and force displayed were appropriate under the circumstances, we refer to the information available to the officer at the time of the investigatory stop and observations by the officer subsequent to the stop. In Pinkard, we "first note[d] that the officers did not control the time of day or location," but were responding to a phone call. Pinkard, 327 Wis. 2d 346, ¶49. Similarly, here, Blatterman's seizure stems from Nisius being dispatched in response to a phone call by Blatterman's wife.

¶54 Nisius and the other officers undeniably displayed overt authority and force when they stopped Blatterman and handcuffed him. This initial show of authority, exerted by three officers who were involved in the investigatory stop, was based on reasonable suspicion.[16] Nisius placed Blatterman, handcuffed, in the back of his squad car while he waited for EMS

---

[16] The involvement of several officers during the stop does not foreclose their exercise of a community caretaker function. In Pinkard, we held that officers reasonably exercised their community caretaker function when they entered and searched a residence for two unconscious individuals. Pinkard, 327 Wis. 2d 346, ¶2. After receiving an anonymous tip about the unconscious individuals, an officer thought the residence sounded like a "drug house." Id., ¶54. We held that sending five officers from the unit that performed narcotics investigations "was a reasonable precautionary measure to prepare for another eventuality." Id.

27

because it was very cold outside and Blatterman was wearing a short-sleeve shirt and jeans without a jacket or coat. Blatterman was transported to the hospital, following his refusal to accept medical treatment from EMS, because Nisius remained concerned. His concern was reasonable given Blatterman's wife's report that he had attempted to blow up his house by drawing gas inside; he possibly was intoxicated; he may have had thoughts of suicide; he failed to follow the officer's directives; and he had chest pain.

¶55 The degree of force and display of authority were reasonable given the officer's concerns for Blatterman's physical and mental health. Therefore, we conclude that the second factor favors the conclusion that the officer reasonably performed his community caretaker function.

### c. vehicle

¶56 The third factor addresses whether a person's privacy interests were being invaded while he or she was in a vehicle. Here, Blatterman's comments that his chest hurt could evidence a heart condition, and his wife had reported that he may have been drunk. Medical assessment of both concerns was required because if Blatterman were to have a heart attack or was intoxicated, he could cause harm to other drivers, as well as to himself. See Kramer, 315 Wis. 2d 414, ¶44. Furthermore, "a citizen has a lesser expectation of privacy in an automobile." State v. Ziedonis, 2005 WI App 249, ¶31, 287 Wis. 2d 831, 707 N.W.2d 565. Accordingly, this factor weighs in favor of the conclusion that the officer reasonably performed a community caretaker function.

28

d. alternatives

¶57 Under the fourth factor, "we consider the feasibility and availability of alternatives" to taking Blatterman to the hospital. Kramer, 315 Wis. 2d 414, ¶45. Blatterman argues that calling the EMS was sufficient to address any medical concern. However, this alternative, which stops short of Nisius transporting Blatterman to the hospital, fails to acknowledge the circumstances surrounding Blatterman's stop. At the time that officers took Blatterman into custody, he had refused to comply with the officers' commands; the officers also were concerned about possible carbon monoxide poisoning, possible suicidal thoughts, and his chest pain.

¶58 As we have explained previously, "[p]rinciples of reasonableness demand that we ask ourselves whether 'the officers would have been derelict in their duty had they acted otherwise.'" Pinkard, 327 Wis. 2d 346, ¶59 (quoting State v. Deneui, 775 N.W.2d 221, 239 (S.D. 2009)) (additional internal quotation marks omitted). For example, if the officer, despite the information relayed by dispatch and his observations of Blatterman during the investigatory stop, had facilitated no medical assessment and Blatterman or another member of the community were injured, Blatterman and others would have understandably viewed the lack of medical assessment as shoddy police work. Id. That Blatterman did not require treatment at the hospital for any physical or mental health issue is not relevant to our consideration. See id. (stating "'that, as it turned out, no one was injured is of no moment'") (quoting State

29

v. Hedley, 593 A.2d 576, 582 (Del. Super. Ct. 1990)). Hindsight is often 20/20. Based on the circumstances relevant to this inquiry, we conclude that the fourth factor also weighs in favor of concluding that the officer reasonably exercised his community caretaker function.

¶59 We conclude that the officer was engaged in a bona fide community caretaker function and that he exercised the community caretaker function reasonably under the totality of the circumstances. Therefore, Nisius's transportation of Blatterman to the hospital was a lawful community caretaker function.

### III. CONCLUSION

¶60 We conclude that Blatterman's stop and detention satisfied the reasonableness requirement of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution because they were supported by reasonable suspicion to conduct an investigatory detention. Blatterman's arrest, which occurred when Nisius transported Blatterman to the hospital, satisfied the reasonableness requirement of the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution because Nisius then had probable cause to arrest Blatterman. Furthermore, the transportation to the hospital was lawful as a community caretaker function of law enforcement. Accordingly, we reverse the court of appeals decision that reversed the circuit court's denial of Blatterman's motion to suppress.

*By the Court.*—The decision of the court of appeals is reversed.

¶61 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority opinion. I write further to briefly explain why the officer here was not required to first administer a preliminary breath test ("PBT") to Dean Blatterman in order to have his blood tested at the hospital.[1] I also concur and write separately to further discuss why odor alone establishes probable cause to arrest and test a serial offender, like Blatterman, who smells of intoxicants and is driving. We took this case to do more than apply previously existing probable cause principles. We accepted review in this case to decide whether there is probable cause to arrest and test a driver, who is subject to the .02% alcohol concentration limit,[2] based upon odor of alcohol alone.

---

[1] Blatterman's blood draw occurred before the United States Supreme Court's decision in Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013). In McNeely the United States Supreme Court held that "the natural metabolization of alcohol in the bloodstream [does not present] a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552, 1556 (2013). Thus, under McNeely, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561 (citation omitted). A warrantless blood draw is constitutional under McNeely if justified by exigent circumstances. State v. Tullberg, 2014 WI 134, ¶¶41-51, 359 Wis. 2d 421, 857 N.W.2d 120. However, we need not determine whether exigent circumstances justified Blatterman's blood draw because he does not rely on McNeely. Further, the good faith exception to the exclusionary rule would apply because the blood draw occurred before McNeely. See State v. Kennedy, 2014 WI 132, ¶¶35-37, 359 Wis. 2d 454, 856 N.W.2d 834; State v. Foster, 2014 WI 131, ¶¶47-58, 360 Wis. 2d 12, 856 N.W.2d 847.

[2] "Alcohol concentration" means "[t]he number of grams of
(continued)

¶62 Why is it important to address this issue? The courts and law enforcement face these real life determinations when evaluating whether probable cause to arrest exists for a .02% prohibited alcohol concentration ("PAC") offense, especially in light of Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013). For example, what if the officer had sought a warrant to draw a suspected .02% PAC offender's blood based upon odor alone? Does probable cause exist or not? What if a law enforcement officer had asked a suspected offender——known to be a repeat operating-while-intoxicated ("OWI") offender, subject to a .02% PAC legal limit and smelling of intoxicants——to submit to a PBT, and the PBT was refused? Would the suspect be free to leave? Are officers on scene always required to obtain a PBT from a suspected .02% PAC offender? If a PBT is refused, is that, coupled with odor, enough for probable cause? What if the officer does not have a PBT device? Are officers without the lawful ability to pursue whether such chronic offenders are committing the crime of operating with a .02% PAC or above?[3] What exactly is required to establish probable cause for the stand-alone crime, operating in violation of a .02% PAC limit? We should explain what we expect of our law enforcement and the courts. Now is the time to answer those pressing questions. I would conclude that odor of intoxicants alone establishes

---

alcohol per 100 milliliters of a person's blood" or "[t]he number of grams of alcohol per 210 liters of a person's breath." Wis. Stat. § 340.01(1v)(a), (b).

[3] Contrary to Wis. Stat. §§ 346.63(1)(b) and 340.01(46m)(c).

2

probable cause for the crime of operating with an alcohol concentration of .02% or above.

¶63 I reach my conclusion because the legislature has spoken by enacting legislation that prohibits a serial OWI offender, like Blatterman, from operating a motor vehicle with this exceedingly small amount of alcohol, .02%, in his system. The legislature essentially imposed an absolute sobriety standard by adopting the .02% limit for serial OWI offenders while they are operating a motor vehicle.[4] The legislature did not set such an extraordinarily low legal limit for first, second, or third offenders. In fact, most drivers are subject to a PAC legal limit of .08%, not a limit of .02%. Blatterman, however, was subject to this low legal limit, .02%, because he had three prior OWI-related convictions.[5] When officers encountered him driving on March 19, 2013, knowing that he was subject to a .02% PAC legal limit and that he smelled of

_____

[4] "Beginning on January 1, 2001, [1999 Wis.] Act 109 require[d] that drivers with three or more prior convictions may not exceed an absolute sobriety standard of .02 BAC. (A BAC of .02 is considered 'absolute sobriety' because of the limitations in breath testing devices and the fact that the slight alcohol content of mouthwash or some medications can influence a test.)" Legislative Briefs, OWI Laws Revised, LB-00-7, at 1 (July 2000), available at http://legis.wisconsin.gov/lrb/pubs/lb/00lb7.pdf. The Legislative Reference Bureau's "statements carry some weight" and its "analyses are entitled to consideration." Schilling v. State Crime Victims Rights Bd., 2005 WI 17, ¶22 n.7, 278 Wis. 2d 216, 692 N.W.2d 623 (citation omitted).

[5] OWI-related convictions include "prior convictions, suspensions or revocations, as counted under [Wis. Stat. §] 343.307(1)." See Wis. Stat. § 340.01(46m)(c). Specifically, Blatterman previously violated the OWI laws once in 1991 and twice in 1992, which makes the present offense a fourth offense.

3

intoxicants, the officers were not wrong to pursue whether Blatterman was operating with a PAC. I would not limit this case to a discussion of probable cause for Blatterman. This court's role is not that of error correcting. We accept cases to discuss broader issues. I would do so and conclude that those serial offenders, such as Blatterman, who are subject to a .02% PAC limit, may be arrested and tested if they are operating a motor vehicle and smell as if they have been drinking alcohol. In other words, courts and law enforcement should know that probable cause, for these serial offenders, is established based upon odor of intoxicants alone.

## I. THE OFFICERS HAD PROBABLE CAUSE TO ARREST AND TEST BLATTERMAN UNDER THE FACTS OF THIS CASE

¶64 Blatterman's traffic stop was not an ordinary OWI investigation. Blatterman was pulled over because his wife called police to report that he had driven away from their house after he tried to blow it up or start it on fire by drawing in carbon monoxide. She also reported that he might be intoxicated and that he had mentioned "suicide by cop" in the past. Officers subsequently found Blatterman's vehicle and performed a "high risk" traffic stop. Immediately after being pulled over, Blatterman exhibited odd and potentially dangerous behavior. Contrary to the officers' orders, Blatterman exited his vehicle and began to approach the officers. He was wearing jeans, boots, and a short-sleeve shirt without a coat, although the temperature outside was freezing cold. Even more curiously, Blatterman continued walking toward the officers despite the fact that the officers were pointing guns at him and had ordered

4

him to stop moving. His behavior was consistent with a desire to die through "suicide by cop." Blatterman finally stopped walking when he was six to eight feet from the front squad car. The officers told him to turn away and get onto the ground, but he continued facing the officers and knelt down. The officers then put Blatterman to the ground and handcuffed him. Deputy James Nisius later testified that "I smelled alcohol on him when I got up close to him."[6]

¶65 After Blatterman was placed in handcuffs, he told the officers that his chest hurt. Based on his chest pain, the officers were reasonably concerned that he may have impending health issues. Due to his wife's report that he had mentioned "suicide by cop" in the past and that he had been drawing carbon monoxide into the house, the officers were reasonably concerned that he may have been suicidal. Clearly, the officers were concerned about Blatterman's well-being. The officers then summoned emergency medical services ("EMS") to evaluate Blatterman's health, namely, his chest pain. In the meantime, the officers placed Blatterman in the back of a squad car, as he was not dressed appropriately for the cold weather. When EMS arrived, Blatterman refused attention. After EMS talked to Blatterman, but before leaving the scene of the traffic stop, Deputy Nisius checked Blatterman's driving record and discovered that Blatterman, who smelled of intoxicants, had three prior

---

[6] This quote comes from Deputy Nisius's testimony at a hearing on Blatterman's suppression motion, held on July 22, 2013.

5

OWI-related convictions and was therefore subject to a PAC legal limit of .02%. Deputy Nisius subsequently transported Blatterman to a hospital for an evaluation regarding his chest pain. Once at the hospital, Deputy Nisius informed the hospital staff that Blatterman had chest pain, was possibly suicidal, and had been exposed to carbon monoxide. Deputy Nisius also told the hospital staff, "there's potentially a need for a phlebotomist to do a legal blood draw."[7] Hospital staff examined Blatterman and found no concern with his chest pain. Blatterman told hospital staff that he was not suicidal. Deputy Nisius then removed Blatterman's handcuffs and administered field sobriety tests in the hospital examination room.[8] Hospital staff drew Blatterman's blood.[9] Blatterman's blood test results revealed that he had a blood alcohol concentration of .118%, well over the .02% limit to which he was subject while driving.

¶66 Under the facts of this case, the officers could not be expected to request a PBT before transporting an offender like Blatterman to the hospital. Officers stopped Blatterman in response to a serious domestic complaint. Although he was driving normally, Blatterman exhibited undeniably strange,

---

[7] This quote comes from Deputy Nisius's testimony at a hearing on Blatterman's suppression motion, held on July 22, 2013.

[8] The record does not reflect why Deputy Nisius removed Blatterman's handcuffs and administered field sobriety tests, and the record does not reflect how Blatterman performed on the tests.

[9] This blood draw occurred before the United States Supreme Court's decision in Missouri v. McNeely. See supra note 1.

6

disobedient, and volatile behavior. He exited his vehicle after being told not to do so. He then walked straight toward the officers, who were pointing guns at him, after being told not to do so. He was wearing a short-sleeve shirt without a coat in freezing cold weather. His unusual behavior was consistent with the unusual behavior reported by his wife. In light of Blatterman's strange behavior and reported past remark about "suicide by cop," the officers had plenty of reason to take him into custody. Blatterman was also complaining of chest pain. The officers were certainly reasonable to transport him to the hospital and not administer any tests at the scene——even a PBT. To require an officer to ignore these facts and request a PBT, instead of responding to the immediate needs of the situation at hand, is inconsistent with our case law and common sense.[10]

¶67 In the case at issue, these legitimate concerns alone support the officers' decision to transport Blatterman to a hospital for testing without first requesting that he submit to a PBT. Should officers be expected to request a PBT breath sample from a driver who smells of alcohol, is subject to a .02% PAC legal limit, acts very strangely, is potentially dangerous,

---

[10] Standard field sobriety tests are not required in order to arrest a suspect for an OWI-related offense. Tullberg, 359 Wis. 2d 421, ¶40 & n.22. A PBT is not required either. See Cnty. of Dane v. Sharpee, 154 Wis. 2d 515, 519, 453 N.W.2d 508 (Ct. App. 1990) ("There is no question that, absent the preliminary breath test, probable cause existed for the arrest."); Cnty. of Jefferson v. Renz, 231 Wis. 2d 293, 316, 603 N.W.2d 541 (1999) ("An officer may request a PBT to help determine whether there is probable cause to arrest a driver suspected of OWI . . . ." (emphasis added)).

and has chest pain? No. Our precedent does not require a PBT under these circumstances, and the majority opinion is correct not to require that here. However, we did not accept review of this case to recite existing precedent or to apply previously existing probable cause principles. Hence, I engage in the following analysis to address the more pressing issue——why we accepted review.

## II. AN OFFICER HAS PROBABLE CAUSE TO ARREST AND TEST A MOTORIST IF THE MOTORIST EMITS AN ODOR OF INTOXICANTS AND THE OFFICER KNOWS THE MOTORIST IS SUBJECT TO A PROHIBITED ALCOHOL CONCENTRATION LEGAL LIMIT OF .02%

¶68 I write separately because I conclude that odor of intoxicants alone is sufficient to establish probable cause to arrest and further test an operator of a motor vehicle when the officer knows that the operator has three or more previous OWI-related convictions. When practical, a PBT will be a useful tool in determining whether to arrest and further test. In general, PBTs serve to bolster the probable cause analysis. However, a PBT is not always required and if it is refused by the chronic offender who is required not to exceed a .02% PAC while driving, I would conclude that probable cause to arrest exists based upon odor alone. Field sobriety tests may also be administered, but are not required, for the seemingly obvious reason that in order to exceed the .02% PAC legal limit, the operator need not exhibit any indicia of intoxication or impairment. Because the law requires that this class of serial drunk drivers maintain an alcohol concentration of less than .02% if operating a motor vehicle, probable cause must exist

8

based on the odor of alcohol alone. These repeat drunk drivers are already on notice that they place themselves at great risk of arrest if they ingest any amount of alcohol and get behind the wheel.

¶69 The law concerning probable cause is not new. Probable cause is required for an arrest to be valid. State v. Secrist, 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999) (citing State v. Mitchell, 167 Wis. 2d 672, 681, 482 N.W.2d 364 (1992)). "Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime." Id. (citations omitted). "There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." Id. (citing Mitchell, 167 Wis. 2d at 681-82). Probable cause to arrest depends on the totality of the circumstances. State v. Kennedy, 2014 WI 132, ¶21, 359 Wis. 2d 454, 856 N.W.2d 834. An officer may have probable cause to arrest a person for an OWI-related offense without administering a PBT.[11] See Cnty. of Dane v.

---

[11] There are many reasons why an officer might not request a PBT. Perhaps a motorist who is suspected of committing an OWI-related offense is unconscious or otherwise incapable of submitting to a PBT. See State v. Disch, 129 Wis. 2d 225, 236, 385 N.W.2d 140 (1986) (holding that the defendant was not conscious enough to give or withhold consent to submit to testing under Wis. Stat. § 343.305, Wisconsin's implied consent law). Perhaps the motorist is in need of medical care. See Tullberg, 359 Wis. 2d 421, ¶¶48-51 (upholding a blood draw of a suspected drunk driver who was hospitalized and in need of a CT
(continued)

9

Sharpee, 154 Wis. 2d 515, 519, 453 N.W.2d 508 (Ct. App. 1990) ("There is no question that, absent the preliminary breath test, probable cause existed for the arrest."); Cnty. of Jefferson v. Renz, 231 Wis. 2d 293, 316, 603 N.W.2d 541 (1999) ("An officer may request a PBT to help determine whether there is probable cause to arrest a driver suspected of OWI . . . ." (emphasis added)).

¶70 Given that a law enforcement officer must have probable cause in order to arrest, it is important to pay heed to the elements of the PAC offense and then evaluate what quantum of evidence satisfies probable cause for each element. This crime is not complex. The legislature enacted Wis. Stat. § 346.63(1)(b), which has only two elements: (1) operating a motor vehicle; (2) with a PAC. See State v. Alexander, 214

---

scan). Perhaps the motorist is hospitalized and receiving medical attention. See State v. Seibel, 163 Wis. 2d 164, 182-83, 471 N.W.2d 226 (1991) (upholding a blood draw of a suspected drunk driver who was receiving treatment at a hospital for an automobile accident). Perhaps the motorist is seriously injured. See State v. Wille, 185 Wis. 2d 673, 678-79, 682-85, 518 N.W.2d 325 (Ct. App. 1994) (upholding a blood draw of a suspected drunk driver who was admitted to an emergency room for injuries sustained in an automobile accident). Perhaps officers will encounter an accident scene that possibly resulted from drunk driving but they may not immediately know the identity of the driver responsible for the accident. See State v. Gracia, 2013 WI 15, ¶¶6-7, 40-41, 345 Wis. 2d 488, 826 N.W.2d 87 (upholding the arrest of a suspected drunk driver who fled the scene of an automobile accident); see also Tullberg, 359 Wis. 2d 421, ¶¶12-16 (explaining that the defendant and a passenger in his truck falsely told a detective that the defendant had not been driving his truck when it was involved in an OWI-related accident). For these reasons and many more, an officer might choose not to request a PBT.

10

Wis. 2d 628, 651, 571 N.W.2d 662 (1997); Wis JI——Criminal 2696. If a person has "3 or more prior convictions, suspensions or revocations, as counted under [Wis. Stat. §] 343.307(1)," his or her PAC is .02%. Wis. Stat. § 340.01(46m)(c).

¶71 Specifically, the legislature has determined that for this unique group of repeat drunk drivers, .02%, not .08%, is a PAC. See 1999 Wis. Act 109, §§ 16d, 16e.[12] In adopting such a low legal limit, the legislature essentially required absolute sobriety of this group of drivers. The Legislative Reference Bureau has explained that "Act 109 require[d] that drivers with three or more prior convictions may not exceed an absolute sobriety standard of .02 BAC. (A BAC of .02 is considered 'absolute sobriety' because of the limitations in breath testing devices and the fact that the slight alcohol content of mouthwash or some medications can influence a test.)" Legislative Briefs, OWI Laws Revised, LB-00-7, at 1 (July 2000), available at http://legis.wisconsin.gov/lrb/pubs/lb/00lb7.pdf.

¶72 Operating a motor vehicle with a PAC is a stand-alone crime. See Wis. Stat. § 346.63(1)(b). As for the first element, if one is driving, probable cause undoubtedly exists with respect to this element. The second element becomes the issue before the court. What information would lead a reasonable police officer to believe that the defendant's

---

[12] The 02% PAC legal limit took effect on January 1, 2001. See 1999 Wis. Act 109, § 91. This court decided Renz in 1999, and the traffic stop at issue in that case occurred in 1996, several years before the .02% PAC legal limit took effect. See Renz, 231 Wis. 2d at 296.

11

alcohol concentration probably is .02% or above? Not much. In my view, odor of intoxicants must be sufficient. No other indicia of intoxication can be required to establish probable cause for this crime for which intoxication has no significance. Clearly, the legislature did not contemplate intoxication or impairment when it chose .02% as the legal limit. As the court in State v. Goss aptly recognized, "[t]he ordinary investigative tools employed in an investigation of an OWI case with a .08 PAC standard are of little or no use where the PAC standard is [.02] because the ordinary physical indications of intoxication are not typically present in a person with that level of blood alcohol content." State v. Goss, 2011 WI 104, ¶27, 338 Wis. 2d 72, 806 N.W.2d 918.

¶73 Simply stated, a person can commit a PAC offense without being or appearing intoxicated or impaired. A person who is subject to a .02% PAC legal limit could rarely, if ever, exhibit any sign of intoxication or impairment when operating with a PAC. To require more than odor of an intoxicant would require more than is legislatively contemplated.

¶74 Specifically, an operator who is subject to this low legal limit can certainly reach a .02% PAC without exhibiting any of the traditional indicia of intoxication. See State v. Muehlenberg, 118 Wis. 2d 502, 505, 347 N.W.2d 914 (Ct. App. 1984). In other words, such a prior offender need not be intoxicated or otherwise impaired in order to be in violation of the PAC law. Id.; see also State v. Bohacheff, 114 Wis. 2d 402, 414, 338 N.W.2d 466 (1983). For these offenders, the

12

legislature must have intended that odor of intoxicants alone raises a red flag. A PAC violation is "highly plausible" when a person who is subject to a PAC legal limit of .02% operates a motor vehicle and smells of alcohol. Goss, 338 Wis. 2d 72, ¶26. An officer certainly has probable cause to arrest when a law violation is "highly plausible." See Secrist, 224 Wis. 2d at 212 (citation omitted) (explaining that probable cause to arrest requires more than suspicion or a possibility, but the evidence need not establish that guilt is more likely than not). Indeed, in Secrist we held that probable cause to arrest may be based on odor. See id. at 217-18 ("We hold that the odor of a controlled substance may provide probable cause to arrest when the odor is unmistakable and may be linked to a specific person or persons . . . ."). To conclude that the odor of alcohol alone establishes probable cause to arrest and test an offender who is subject to a .02% PAC limit, is to afford proper deference to the legislature's determination that operating with even the smallest amount of alcohol——an alcohol concentration of .02%——is prohibited for those serial drunk drivers.

¶75 Thus, the legislature has spoken and set a particularly low PAC limit for a driver who has three or more prior OWI-related convictions. In other words, the legislature sent a strong message to those serial offenders not to drink and drive. Those serial offenders who want to test what amount of alcohol they can have and not reach .02% do so at great risk. Those drivers know that they place themselves at great risk of arrest if they have any alcohol in their system and get behind

13

the wheel. If this court were to conclude that more than the odor of intoxicants is required to arrest a motorist subject to a .02% PAC legal limit, we would undermine, if not invalidate, the .02% PAC offense as a stand-alone crime. See Wis. Stat. §§ 346.63(1)(b), 340.01(46m)(c). Our court is to listen to the policy choices of the legislature, and here the law is clear.

¶76 Blatterman argues that Goss requires a PBT under all circumstances. It does not. In fact, Goss supports the conclusion that I reach today. The sole question before the Goss court was whether the officer had probable cause to request a PBT. Goss, 338 Wis. 2d 72, ¶2. The court concluded that a PBT may be requested of a prior offender who is subject to a .02% PAC legal limit based upon odor alone. Id., ¶¶2, 25-27. The Goss court did not address whether a PBT was required in order to arrest someone for a PAC offense. The Goss court did not decide what happens if the operator refuses a PBT. Under a natural extension of Goss, an officer has probable cause to arrest a driver who smells of alcohol and is subject to a PAC legal limit of .02%, even if the driver does not exhibit strange behavior like Blatterman did. Although Blatterman is correct that probable cause to request a PBT is a lower standard than probable cause to arrest,[13] his grounds for arguing that odor

---

[13] Probable cause to request a PBT requires "'a quantum of proof that is greater than the reasonable suspicion necessary to justify an investigative stop, and greater than the "reason to believe" necessary to request a PBT from a commercial driver, but less than the level of proof required to establish probable cause for arrest.'" State v. Goss, 2011 WI 104, ¶25, 338 Wis. 2d 72, 806 N.W.2d 918 (quoting Renz, 231 Wis. 2d at 317).

14

alone is not probable cause to arrest a .02% PAC offender are not particularly persuasive.[14] Although those two standards are different, each standard is satisfied by the odor of alcohol on a driver who is subject to a .02% PAC legal limit.

¶77 Finally, I address why, even if we were to conclude that odor alone is sufficient in .02% PAC cases, law enforcement will most often resort to using a PBT first, if practicable. As a practical matter, an officer will likely request a PBT from a driver who smells of alcohol and who is subject to a PAC legal limit of .02%. Goss allows officers to do so based on odor alone. Requesting a PBT can help to resolve doubt as to whether such a driver has a .02% PAC or above. If the PBT results reveal that a motorist does not have a PAC, the officer may release the motorist, save time, and proceed onto other duties. An officer would not likely prefer to arrest such a driver, go through the required paperwork, transport the suspect to testing, perhaps spend time and significant resources to get a search warrant from a judge, sit at a hospital waiting for a

---

[14] It may be worthwhile to spend a few moments considering the facts of Goss and the case now before the court. Goss and Blatterman were both pulled over for reasons unrelated to suspicion of OWI. Neither Goss nor Blatterman were originally being investigated for OWI. Each of them was placed in a squad car for reasons unrelated to suspicion of OWI. Officers began to suspect both Goss and Blatterman of a PAC violation after placing them in squad cars. In each of the cases, the officers knew that the defendant was subject to a .02% PAC legal limit before requesting sobriety testing. In Goss the officer requested Goss to submit to a PBT, the results of which indicated that further testing could be pursued. In the present case, the officers did not ask Blatterman to submit to a PBT——for good reason (see section I of this concurrence.).

15

blood draw, and all the time take one more officer off the street, when a PBT is a quick and easy tool at the officer's disposal. The practical nature of a PBT being used in most circumstances involving such a driver is apparent. Although Goss does not require an officer to request a PBT before arresting a driver who smells of alcohol and is subject to a PAC legal limit of .02%, Goss certainly instructs that an officer is allowed to do so. I have no doubt that law enforcement will most often request that a suspected .02% PAC offender submit to a PBT in lieu of all that ensues when someone is otherwise taken into custody.

¶78 When we decline to answer the issues for which we accepted review in this case, we leave significant uncertainty for the courts and law enforcement. We should answer whether odor of intoxicants alone is probable cause to arrest those operators who are subject to a .02% PAC legal limit. If the officers had requested that Blatterman submit to a PBT, what would have happened if he refused? Goss does not answer that; we should. Could a driver like Blatterman, who exhibited very odd and potentially dangerous behavior, avoid being arrested and tested for a PAC violation because a PBT was not administered? Goss does not answer that; we should. Law enforcement and the courts could benefit from us answering whether odor alone is sufficient to establish probable cause for these serial offenders.

¶79 Although I join the majority opinion, I write separately to explain that Deputy Nisius had probable cause to

16

arrest and test Blatterman based on the facts of this case. I would further conclude that odor of intoxicants alone establishes probable cause sufficient to arrest and test operators of motor vehicles who are subject to the .02% PAC legal limit. For the foregoing reasons, I respectfully concur.

¶80 I am authorized to state that Justice DAVID T. PROSSER joins this concurrence and that Chief Justice PATIENCE DRAKE ROGGENSACK joins section II of this concurrence.