BLANCHARD, J.[1]
¶ 1 Jonalle Ferraro appeals the circuit court's denial of multiple motions to suppress evidence and the judgment of conviction for operating a motor vehicle while under the influence of an intoxicant, third offense. Ferraro makes three arguments: (1) that an officer who had identified her as a suspect following a reported hit-and-run accident violated the Fourth Amendment when he pursued her into the garage attached to her residence; (2) once in the garage, the officer seized her by unreasonable use of force; and (3) she made in-custody statements that must be suppressed because she had not been given Miranda warnings. See Miranda v. Arizona , 384 U.S. 436 (1966). I conclude that the circuit court properly denied all three motions and accordingly affirm.
BACKGROUND
¶ 2 The circuit court found credible the testimony of all witnesses called by the State at the suppression hearing. Ferraro did not call any witnesses. The following summarizes pertinent, uncontested testimony consistent with the court's factual findings. In some instances, I note specific findings of the court.
¶ 3 At 9:25 p.m. one evening, Rock County sheriff's deputies responded to a report of a vehicle accident just east of Edgerton. After initial investigation, deputies conveyed through dispatch to area law enforcement that a black BMW sport utility vehicle, with possible damage to the rear bumper and driven by a white female, had been involved in the accident and fled the scene. The dispatch report indicated a last known direction and location for the BMW, but not the vehicle's license plate number.
¶ 4 Edgerton police Lieutenant Doug Vierck heard the dispatch report while on patrol. Based on the report and his general familiarity with local traffic patterns, Vierck suspected that the reported BMW driver might end up on Highway 51 in or near Edgerton. Pursuing that hunch, Vierck traveled north on Highway 51 and observed a black BMW sport utility vehicle heading in the opposite direction on Highway 51.[2] The driver appeared to be a white female. Requesting additional information from dispatch, Vierck learned that the BMW involved in the hit-and-run reportedly had a trailer hitch.
¶ 5 Vierck turned around and followed the BMW as it traveled onto Blaine Street, and noticed that it had a trailer hitch. He activated his red and blue emergency flashing lights in an attempt to pull it over. The BMW continued south on Blaine, then came to a stop at the intersection with Bel Aire Avenue. The BMW signaled a turn east onto Bel Aire, but instead of turning as indicated it continued straight through the intersection. When the BMW entered the Bel Aire intersection, Vierck activated his siren (as a supplement to the red and blue lights that he had activated before BMW reached the Bel Aire intersection) and continued to follow. The BMW did not pull over in response to Vierck's lights and siren for approximately one tenth of a mile. It pulled into the driveway, and then the attached garage, of a residence on Blaine Street.
¶ 6 Ferraro was the driver of the BMW, with no passengers. The circuit court found that Ferraro "attempt[ed] to evade lawful arrest," by ignoring the lights and siren on Vierck's squad car and pulling into the driveway and then the garage.
¶ 7 Vierck called out his location to dispatch, got out of his squad car, and entered the garage on foot to make contact with Ferraro. The circuit court found that Ferraro "attempted to close the garage door" on Vierck, but he was able to slip in before the door closed behind him.
¶ 8 Vierck told Ferraro, as she sat in the driver's seat of the BMW, that she should remain there, then approached her. Vierck asked her to open the garage door, which she eventually did. Vierck also asked her (two times, within approximately one minute) to step from the BMW, which she eventually did. Ferraro said that she wanted to call her husband. Vierck told her that she should put her phone down. Ferraro complied with that request, although at that point she was yelling.
¶ 9 Ferraro's husband entered the garage at about the time that Ferraro got out of the BMW and asked what was going on. Ferraro responded with words to the effect, "I don't know what's going on, someone ... backed into me" at a stop sign.
¶ 10 Vierck explained to Ferraro that she was a suspect in a hit-and-run accident. Vierck noticed an odor of intoxicants on Ferraro's breath. With the husband's entry to the garage, it became "a little chaotic for a couple of minutes," with Ferraro yelling, as her husband continually asked what was going on.
¶ 11 Vierck placed one of Ferraro's arms behind her back. Ferraro told Vierck that she had a bad shoulder that dislocates. Vierck tried to get Ferraro to exit the garage, ordering her several times to leave with him. He did this to try to calm down the situation.
¶ 12 As Vierck attempted to direct Ferraro out of the garage, she tensed up and he "thought that she was trying to be resistive." Based on his perception that she was resisting, he yelled at her to stop resisting. He asked her to put her hands behind her back to be handcuffed and she complied. This occurred about two minutes after she had stepped out of the BMW.
¶ 13 At around the time that Vierck escorted Ferraro out of the garage, additional law enforcement officers arrived. Eventually a total of eight to nine law enforcement officers were on the scene. The husband fetched a coat, which Vierck draped over Ferraro's shoulders to keep her warm.
¶ 14 About 10 minutes after Vierck and Ferraro walked out of the garage, Ferraro complained that her shoulder had become dislocated. (The court made a finding that it had in fact become dislocated.) In response, Vierck removed the handcuffs to allow her to adjust her shoulder. Ferraro told Vierck that she was able to successfully manipulate her shoulder to resolve the dislocation. After that, Vierck did not handcuff her again.
¶ 15 In referring to Vierck's interactions with Ferraro, the court found that she "was never told that she was under arrest." The court also found that Ferraro "wasn't in the handcuffs for more than 17 minutes." The court further found that Ferraro had "not been compliant" with directions from Vierck, based on Vierck's testimony that he had to order her "two or three times" to take certain actions, including asking her to leave the garage with him.
¶ 16 Later, at a time when Ferraro was located outside the garage, probably on the driveway, and in any case not in handcuffs, one of the responding deputies, Ross Wenger, questioned Ferraro. During that interview the deputy detected the odor of intoxicants on her breath and observed her eyes to be "bloodshot and glossy." Wenger completed field sobriety tests with Ferraro on the sidewalk in front of Ferraro's house and eventually arrested her for operating while intoxicated.
¶ 17 Ferraro was charged with two drunk driving offenses and hit-and-run involving an attended vehicle. As pertinent to this appeal, she moved for an order suppressing all evidence obtained as a consequence of her detention, alleged arrest, and seizure by Vierck. She argued that her detention and alleged arrest were unlawful on multiple grounds, including a lack of reasonable suspicion or probable cause. She separately moved for an order suppressing all statements she made in response to custodial interrogation before police gave her Miranda warnings.
¶ 18 Following an evidentiary suppression hearing and briefing by the parties, the court denied each motion on the ground that the State had carried its burden of proof on each pertinent issue. Ferraro entered a plea to the operating while intoxicated charge and now appeals.
DISCUSSION
I. ENTRY TO GARAGE
¶ 19 There is no dispute about the following: Ferraro may claim Fourth Amendment protection for the garage as curtilage of her residence; Vierck did not have a search or arrest warrant permitting him to enter the garage; and no one with apparent authority gave Vierck consent to enter the garage. The State argues, based on shared reasoning of at least four justices reflected in State v. Weber , 2016 WI 96, 372 Wis. 2d 202, 887 N.W.2d 554, that Vierck's entry to the garage was lawful under the hot pursuit exigency exception to the Fourth Amendment. I conclude that, on the facts presented here, the State showed that garage entry was justified by the hot pursuit exception.
¶ 20 Warrantless searches and seizures in residences (including curtilage) are presumptively unreasonable under the Fourth Amendment, subject to well-defined exceptions. State v. Richter , 2000 WI 58, ¶ 28, 235 Wis. 2d 524, 612 N.W.2d 29. Under one exception, warrantless police entry to a home is lawful under exigent circumstances. Id. , ¶ 2. One category of exigent circumstances is hot pursuit of a suspect. Id. In order to justify an intrusion under an exigency such as hot pursuit, the State must show that it was (1) supported by probable cause and (2) justified by exigent circumstances. State v. Robinson , 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463. I address probable cause, then exigent circumstances.
Probable Cause
¶ 21 Courts apply the following test to determine whether the State has shown probable cause:
Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime. There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not.
State v. Secrist , 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999) (citations omitted).
¶ 22 I agree with the circuit court that the State carried its burden of showing that a reasonable officer in Vierck's position before he entered the garage would believe that Ferraro had probably committed three offenses: fleeing an officer, resisting or obstructing, and hit-and-run. See WIS. STAT. §§ 346.04(2t) (Subsection of "Obedience to traffic officers, signs and signals; fleeing from officer."), 946.41(1) (Subsection of "Resisting or obstructing officer."); 346.67 ("Duty upon striking person or attended or occupied vehicle.").[3]
¶ 23 The indicia of fleeing and resisting or obstructing were quite strong. The circuit court credited testimony supporting findings that Ferraro failed to pull over as she drove, through what was apparently a residential area, first stopping at an intersection and making a false turn signal after Vierck had activated his emergency lights, and then proceeding without stopping over the course of more than the length of 1-1/2 football fields, despite the addition of the siren, and then tried to close the garage door on the pursuing Vierck.[4]
¶ 24 The indicia of hit-and-run may be slightly less strong, but it is sufficient. Based on the factual summary above, Vierck could reasonably have believed the following: (1) there had been a recent, nearby vehicle accident; (2) the driver of a vehicle matching the description given by dispatch had been involved in the accident and had failed to stop her vehicle; (3) he spotted a vehicle matching in all respects the characteristics given by dispatch, including that the vehicle was of a type not common to the area, a black BMW sport utility vehicle with a trailer hitch, and was driven by a white woman; (4) the vehicle matching the dispatch description appeared in a place and at a time where and when Vierck suspected the hit-and-run driver might drive based on his knowledge of the area; (5) Ferraro failed to pull over in response to his emergency lights, even with siren added, and instead proceeded further than the length of 1-1/2 football fields and into a residential garage; and (6) she tried to close the garage door on the pursuing Vierck.
¶ 25 Ferraro's contrary arguments lack merit. She argues that Vierck lacked probable cause because he "had neither spoken with Ms. Ferraro to determine her whereabouts that evening nor examined her vehicle" and "did not know the license plate of the vehicle associated with the hit-and-run." The test is not whether there was information that the officer lacked might have subtracted from probable cause but whether the totality of the available information was sufficient. Ferraro makes no serious attempt to undermine the State's argument based on the correct standard.
Exigent Circumstance Of Hot Pursuit
¶ 26 I conclude that the State met its burden of showing that, when he entered the garage, Vierck had probable cause to believe that Ferraro had just committed or was then committing multiple jailable offenses and that there were exigent circumstances to justify warrantless pursuit of Ferraro into the garage.
¶ 27 Ferraro argues that Vierck could not have been in hot pursuit of Ferraro for the hit-and-run offense because his pursuit did not originate from the scene of the accident. This argument begins with an emphatic citation to Richter , 235 Wis. 2d 524, ¶ 32, for the following proposition regarding hot pursuit: "[I]mmediate and continuous contact must occur from the scene of the crime-not from the point the officer first tries to make contact." (Emphasis in original) However, Ferraro ignores the next paragraph of Richter , which explicitly states that immediate response to a report coming from an eyewitness may be sufficient. Id. , ¶ 33. Indeed, Ferraro's argument appears to be defeated by the holding in Richter that police pursuit of a suspected burglar was continuous for purposes of the hot pursuit doctrine, even though the pursuing officer arrived after the crime had occurred and, therefore, did not personally observe the crime or the fleeing suspect. See id. , ¶¶ 33, 36.[5]
¶ 28 Ferraro also argues that, although hit-and-run and fleeing an officer are both jailable offenses, they are minor offenses and thus not sufficient. See Welsh v. Wisconsin , 466 U.S. 740, 750 (1984) ("When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate."). However, this ignores that our supreme court has clarified that the primary guide in determining what is "minor" as it pertains to the Welsh standard is whether the offense or offenses are jailable. See State v. Ferguson , 2009 WI 50, ¶¶ 29-30, 317 Wis. 2d 586, 767 N.W.2d 187 (Welsh standard should not be based on misdemeanor/felony distinction, but instead the distinction between jailable and non-jailable offenses). Accordingly, I disagree with Ferraro that the offenses that Vierck had probable cause to believe she had committed were so minor that the State had an elevated burden to show that Vierck was reasonable in entering the garage without consent or a warrant.[6]
II. SEIZURE IN GARAGE
¶ 29 Ferraro argues that the force Vierck used in restraining her after confronting her in the garage was excessive and therefore unreasonable under the Fourth Amendment. I reject this argument on the ground that Ferraro failed to preserve it for appeal in the circuit court.[7] See State v. Hayes , 2004 WI 80, ¶ 21, 273 Wis. 2d 1, 681 N.W.2d 203 (appellate courts generally do not consider issues raised for the first time on appeal).
¶ 30 Ferraro cites case law addressing claims made under 42 U.S.C. § 1983 alleging police use of excessive force during arrests, and not Wisconsin criminal law addressing suppression of evidence or other potential remedies based on Fourth Amendment violations. Putting aside that potential problem, I resolve this issue without regard to any particular legal standard because she failed to preserve the issue.
¶ 31 The argument Ferraro now makes is that Vierck unreasonably seized her in the garage primarily because, as Ferraro puts it, "[b]efore Lt. Vierck handcuffed her, Ms. Ferraro warned him her shoulder dislocated. He handcuffed her, anyway." However, she failed to present this as an independent basis for the court granting any particular remedy in this criminal case. It is therefore understandable that the circuit court did not make a ruling on this topic and did not make especially detailed related findings.
III. STATEMENT MADE IN PRESENCE OF POLICE
¶ 32 Ferraro apparently intends to argue that all statements she made in the presence of Lieutenant Vierck and Deputy Wenger on the night of her eventual arrest must be suppressed because she was in custody when she made the statements but had not been given her rights under Miranda . I first address statements made in the presence of Vierck and conclude that Ferraro fails to identify a statement that could be subject to suppression. I then address statements she made in the presence of Wenger before he formally placed her under arrest and conclude that, under the controlling case law, Ferraro was not then subject to restraints associated with formal arrest.
¶ 33 It is undisputed that Vierck did not advise Ferraro of her rights. However, as the circuit court found and the State points out on appeal, the only statement that Ferraro made in the presence of Vierck was one summarized above, which came in response to a question by the husband, not by Vierck. In her reply brief, Ferraro has no coherent rejoinder on this point, effectively conceding it. She merely cites to the testimony given by Vierck that Ferraro made this statement in response to a question by the husband.
¶ 34 This leaves statements made in the presence of Wenger. It is undisputed that Wenger did not advise Ferraro of her rights in advance of her formal arrest.
¶ 35 A person is considered to be arrest status when a " 'reasonable person' " in his or her position would consider himself or herself to be in custody, "given the degree of restraint under the circumstances." State v. Blatterman , 2015 WI 46, ¶ 30, 362 Wis. 2d 138, 864 N.W.2d 26 (quoted source omitted). Our supreme court has explained the test as follows:
We consider a variety of factors to determine whether under the totality of the circumstances a reasonable person would feel at liberty to terminate an interview and leave. Such factors include: the degree of restraint; the purpose, place, and length of the interrogation; and what has been communicated by police officers. "When considering the degree of restraint, we consider: whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved."
State v. Bartelt , 2018 WI 16, ¶ 32, 379 Wis. 2d 588, 906 N.W.2d 684 (citations omitted).
¶ 36 Applying these standards, and contrasting the facts here with those in such precedent as Blatterman , I see little reason to conclude that a reasonable person in Ferraro's position would have considered herself under arrest during her interactions with Wenger before her formal arrest: she was not told she was under arrest, not handcuffed or otherwise restrained, not presented with drawn weapons, not frisked, and there is no suggestion of coercive police conduct in connection with her interactions with Wenger.
¶ 37 Ferraro points to the facts that Vierck had yelled during the somewhat chaotic initial interactions and that he handcuffed her and escorted her out of the garage, in the process apparently temporarily dislocating her shoulder. However, there is no dispute that Vierck un-handcuffed her after she complained of the shoulder dislocation and that Deputy Wenger did not handcuff her. After the somewhat chaotic initial moments in the garage had passed, and Ferraro was outside the garage, she was not treated in a manner associated with arrest status after the handcuffs were removed.
¶ 38 Ferraro also emphasizes that eight or nine officers had arrived at the residence by the time Wenger interviewed her. However, she fails to explain why the presence of these officers would have indicated to a reasonable person in her shoes that she had been arrested, in light of the circumstances in their totality.
CONCLUSION
¶ 39 The circuit court properly denied Ferraro's motions to suppress evidence. Accordingly, I affirm the judgment of conviction.
By the Court .-Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(c) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The court found that black BMW sport utility vehicles are not commonly seen "in this area."

Pursuant to Wis. Stat. §§ 346.67(1) and 346.74(5)(a), Ferraro faced potential jail time even if the accident did not involve death or injury to a person.

Ferraro asserts that "there is nothing in the facts here that indicate[s] Ferraro knew the officer was behind her until he was in her garage." I have summarized multiple findings made by the court, based on unrebutted testimony credited by the court, that contradict this assertion. Ferraro fails to develop any argument as to why I should conclude that the circuit court clearly erred in making any finding of fact, such as by making internally inconsistent findings or findings for which no inference could arise from the evidence. See State v. Young , 2006 WI 98, ¶ 17, 294 Wis. 2d 1, 717 N.W.2d 729 (appellate courts uphold circuit court findings of historical fact unless clearly erroneous).

After the State accurately relies on State v. Richter , 2000 WI 58, 235 Wis. 2d 524, 612 N.W.2d 29, Ferraro attempts to distinguish it for the first time in her reply brief. This comes too late. In addition, Ferraro fails to persuade me that the fresh, concrete details relayed to Vierck were not the functional equivalent of the witness statements at issue in Richter . And, there is no dispute that, from the moment Vierck identified the BMW as the likely hit-and-run vehicle, allegedly in flight from the scene of the accident, he immediately and continuously pursued the driver, right up to the moment he entered the garage on foot as Ferraro attempted to close the door on him.

I need not address the fragmented opinion in State v. Weber , 2016 WI 96, 372 Wis. 2d 202, 887 N.W.2d 554, because it could not help Ferraro. But it appears that at least four, and perhaps more, justices of our supreme court would decide, based on the particular facts here , that there were exigent circumstances. See Weber , 372 Wis. 2d 202, ¶¶ 2, 21, 23, 35-45, 54, 90. Without going into all pertinent details, Weber drove into the attached garage of his residence after a deputy had pursued him for only about 100 feet, using only the squad emergency lights and not the siren, and Weber did not try to close the garage door on the deputy. See id. Thus, the circumstances presented to the deputy when Weber pulled into his garage were in significant respects less exigent than the circumstances presented to Vierck when Ferraro pulled into her garage. Further, both Weber and the instant case involve criminal offenses that can result in imprisonment, but here there was probable cause to find that Ferraro had not only fled an officer and resisted or obstructed, but also that she had just committed a hit-and-run.

Ferraro asks me to rule in her favor on this issue because the State fails to address her argument. However, in light of the fact Ferraro failed to preserve this issue for appeal, I do not treat her argument as conceded by the State.