COURT OF APPEALS
DECISION
DATED AND FILED

August 14, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1224-CR**

Cir. Ct. No. **2021CT1573**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

ROXANNE RAE REICHERT,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Waukesha County: JENNIFER R. DOROW, Judge. *Affirmed.*

¶1 NEUBAUER, J.[1] Roxanne Rae Reichert appeals from a judgment of conviction entered following her plea of no contest to one count of operating a

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

motor vehicle while under the influence (OWI) in violation of WIS. STAT. § 346.63(1)(a). Reichert contends that the circuit court erred in denying her motion to suppress evidence the police collected after stopping her vehicle. She argues that the police violated her Fourth Amendment rights by stopping her vehicle without reasonable suspicion or other justification and by extending the stop to investigate whether she was driving while impaired.[2] As explained more fully below, this court concludes that neither the initial stop nor the extension violated the Fourth Amendment. Accordingly, the judgment is affirmed.

## BACKGROUND

¶2 The circuit court held a hearing on Reichert's suppression motion at which the officer who stopped her vehicle testified. The court also received and watched video footage of the stop from the officer's squad car. The hearing testimony and video footage reveal the following undisputed, relevant facts.

¶3 On the night of November 26, 2021, Waukesha police received a report from Reichert's neighbor that a male and a female had argued outside Reichert's residence and then left in separate vehicles, the female in a purple Honda Pilot and the male in a silver Chevy Malibu. The neighbor reported further that "the vehicles may have collided" and that a third individual had been present and was following the vehicles in a dark-colored truck. Officer Ryan Solberg responded and began driving towards the residence. On the way, a dispatcher informed him that the male in the silver Malibu had been in touch to say that he would return to the residence to speak with police. Around this time, Solberg also

---

[2] *See* U.S. CONST. amend. IV.

2

learned of "some type of a threat of a gun involved" and that at least one child was in one of the vehicles that may have collided.

¶4    As he continued to search for the Honda Pilot, Solberg approached North University Drive and heard from dispatch that both vehicles had been seen heading south on that road. Solberg then "saw what appeared to be a dark colored SUV that was driving southbound on North University" turn right onto another street. Solberg followed the vehicle and confirmed it was a purple Honda Pilot. He did not observe any damage to the rear of the vehicle and did not know the license numbers of the involved vehicles. He also did not know whether a man or woman was driving the Pilot or how many people were in it.

¶5    Solberg stopped the Pilot after following it for several minutes. At the suppression hearing, he explained that decision as follows:

> There was a domestic incident that occurred, which we did not know the status of any individual and whether or not they were injured. There was also a possible crash involving this vehicle. And there were … the driver and at least one child inside the vehicle.[3] I did not know the status of any injuries of anybody inside the vehicle.
>
> The purple Honda Pilot is a very distinct and specific vehicle at approximately 8:30 p.m., where there were almost no cars on the road. It was in the expected vicinity and area traveling the expected direction at the expected time.
>
> On top of that, my main concern was the well-being of the individuals inside the vehicle.

---

[3] There appears to be a discrepancy between Solberg's testimony that "at least one child" was in Reichert's vehicle and his description of the initial dispatch report, which indicated that a child may have been in one of the vehicles that left Reichert's residence. Because Solberg's degree of certainty on this point at the time he stopped Reichert's vehicle is not legally significant, and neither party proffers an explanation for this discrepancy, this court need not analyze the point further.

¶6      Solberg and two other officers approached the vehicle and asked the driver—Reichert—if she had been in an altercation with her boyfriend. When she confirmed that she had been in an altercation, Solberg asked her to step out of the vehicle to speak further. As she did so, Solberg asked her children if they were okay; one responded that they were. Solberg then asked Reichert if she needed an ambulance, to which she responded, "No, I'm okay." At the hearing, Solberg acknowledged that he had determined that Reichert and her children "appeared to be safe and not in need of any medical assistance" within "a couple minutes of the stop[.]"

¶7      After exiting the vehicle, Reichert walked out of the frame of the squad car video to continue speaking with Solberg. Their ensuing conversation can be heard on the video, but neither Solberg nor Reichert are visible.

¶8      Solberg began by confirming with Reichert that her boyfriend kept multiple firearms in the house and then asked what had happened at her residence. At the hearing, he identified two potential crimes—domestic violence and a hit-and-run—that he was required to investigate.

¶9      Solberg testified that Reichert told him that her boyfriend, with whom she lived, had been "acting strange" and repeatedly contacting her at work that day, so "she wanted to get her kids and take them away from the residence for safety." After Reichert arrived home that evening, she argued with her boyfriend and then went into her residence to gather her kids' belongings. When she came back outside, she saw that her boyfriend had moved his car so that it blocked hers from backing out of the driveway. As a result, Reichert had to drive onto a neighbor's yard and driveway to get around his vehicle and leave the residence.

She denied that her car and her boyfriend's car had made contact or that either vehicle had been damaged.

¶10    After further discussion about the argument, Solberg asked Reichert about the third individual who had been present, whom she identified as her ex-boyfriend. Reichert then began describing the events that led up to the altercation in greater detail. During this portion of the conversation, Reichert recounted threatening statements her boyfriend had recently made. She explained that he had taken one of her children with him to a gas station earlier that day, which made her fearful.

¶11    Approximately thirteen minutes into their conversation, Solberg asked Reichert if she had anything to drink that evening. She stated that she had two drinks "over the course of dinner." Solberg relayed that information, along with Reichert's version of the day's events, to another officer. At the suppression hearing, Solberg testified that the other officer, who was speaking with Reichert's boyfriend, "advised that the root cause of this issue and why the vehicle chase had occurred was because [Reichert] was impaired, and [her boyfriend] was trying to stop her from driving while intoxicated with the kids." At that point, Solberg testified, his investigation "became an investigation into an OWI as well."

¶12    On the squad car video, Solberg can be heard saying that he would probably administer field sobriety tests to Reichert. He acknowledged that she was not slurring her speech but stated that he wanted to make sure she would be able to safely drive away from the scene. Solberg then asked Reichert about her boyfriend's purported concern that she was impaired and should not be driving with her children. Reichert denied that her boyfriend had expressed that sentiment to her and told Solberg that her boyfriend had said "he was going to say whatever

5

it took to keep [her] home." Solberg then told Reichert that he wanted to make sure that she was "okay to drive" in light of her boyfriend's statement and drove her to a nearby gas station to perform field sobriety tests. In total, their conversation up to that point lasted approximately twenty minutes.

¶13 At the hearing, Solberg explained his decision to conduct field sobriety tests as follows:

> There were several—or a few signs of impairment. That being the weaving between the lane[s],[4] the thick[ and] slightly slowed speech, that she admitted to drinking several alcoholic beverages, and the information from Officer Lincoln that the reason behind the road rage, or car crash, or the [boyfriend] trying to stop the female, was due to the fact that she was impaired on alcohol driving with children.

Solberg acknowledged that he did not smell intoxicants on Reichert during their conversation.

¶14 Reichert exhibited clues of impairment on each test Solberg administered. After finishing the tests, Solberg placed Reichert under arrest. A subsequent blood test revealed Reichert's blood alcohol concentration to be in excess of the legal limit.

¶15 At the end of the hearing, the circuit court denied Reichert's motion. The court concluded that the initial stop of Reichert's vehicle was justified under the community caretaker doctrine. The court noted that the stop emerged out of "a very chaotic situation" in which a neighbor called 911 to report a domestic disturbance and possible hit-and-run. The court also referenced Solberg's

---

[4] Solberg acknowledged that he did not refer in his report to Reichert weaving in her lane before the stop as one of the reasons he requested field sobriety tests.

6

testimony, which it described as "very credible," that "[h]is primary concern" and "subjective intent [was] a well-being check."

¶16    The circuit court concluded further that Solberg had reasonable suspicion to extend the stop and conduct field sobriety tests because Reichert drove her vehicle from the scene of the altercation, admitted to Solberg that she had been drinking earlier that day, and spoke to him in a "thick and slow" manner. The court also cited Reichert's boyfriend's concern, which was relayed to Solberg, that she was impaired when she drove away from her residence. Reichert subsequently pled no contest to one count of operating while intoxicated.

## DISCUSSION

¶17    When reviewing a circuit court's denial of a suppression motion, this court applies a bifurcated standard of review. *State v. Scull*, 2015 WI 22, ¶16, 361 Wis. 2d 288, 862 N.W.2d 562. The court's findings of fact are reviewed under the deferential clear error standard, but this court reviews the circuit court's application of the governing legal principles to those facts de novo. *Id.* Here, neither party challenges the circuit court's factual findings; thus, this court focuses on the application of Fourth Amendment principles to the facts.

¶18    The Fourth Amendment generally protects persons "against unreasonable searches and seizures." *See* U.S. CONST. amend. IV. A traffic stop constitutes a seizure for Fourth Amendment purposes. *State v. Floyd*, 2017 WI 78, ¶20, 377 Wis. 2d 394, 898 N.W.2d 560. Such a seizure conducted without a warrant is unreasonable unless an exception to the warrant requirement applies. *See State v. Brown*, 2020 WI 63, ¶10, 392 Wis. 2d 454, 945 N.W.2d 584.

7

¶19 Before this court can apply Fourth Amendment standards to the police conduct in this case, it addresses Reichert's argument that her encounter with the officers included more than one seizure. Where an interaction with police consists of more than one seizure, "the constitutionally-acceptable scope and duration of each seizure is inextricably bound up with its justifiable purpose." *State v. Brooks*, 2020 WI 60, ¶9, 392 Wis. 2d 402, 944 N.W.2d 832. Reichert divides her interaction with Solberg into three phases—(1) the initial stop; (2) an extension of the stop to investigate the reported domestic altercation and possible hit-and-run accident; and (3) a second extension to investigate Reichert for possible OWI. This court will adopt Reichert's three-stage framework for the purpose of its analysis.

## I. The Initial Stop

¶20 Reichert argues that the initial stop of her vehicle was unconstitutional because it was not permitted under either of two potentially applicable exceptions to the warrant requirement—reasonable suspicion or the community caretaker doctrine. This court agrees with the circuit court's conclusion that the initial stop was permissible community caretaker activity.

¶21 The community caretaker doctrine permits law enforcement officials to effect warrantless seizures "to protect property or help 'a member of the public who is in need of assistance.'" *State v. Wiskowski*, 2024 WI 23, ¶15, 412 Wis. 2d 185, 7 N.W.3d 474 (quoting *State v. Kramer*, 2009 WI 14, ¶32, 315 Wis. 2d 414,

759 N.W.2d 598).[5] The doctrine recognizes "that law enforcement work is multifaceted." *Wiskowski*, 412 Wis. 2d 185, ¶15. Police officers enforce the law but also help members of the public who need medical or other assistance. *See Kramer*, 315 Wis. 2d 414, ¶32. When assessing whether a seizure is justified under this doctrine, Wisconsin courts must make three determinations: (1) whether a seizure for the purpose of the Fourth Amendment occurred; (2) whether the officer was engaged in a bona fide community caretaker activity; and (3) whether the public interest furthered by the officer's conduct outweighs the intrusion on the privacy interest of the seized individual. *See State v. Blatterman*, 2015 WI 46, ¶¶43-48, 362 Wis. 2d 138, 864 N.W.2d 26. Here, there is no dispute that Reichert was seized when Solberg stopped her vehicle. Thus, this court focuses on the second and third elements.

## A. Bona Fide Community Caretaker Activity

¶22 In determining whether Solberg was engaged in bona fide community caretaker activity, this court considers the totality of the circumstances and focuses on whether an objectively reasonable basis existed for Solberg to believe that someone in Reichert's vehicle was in need of assistance. *See Kramer*, 315 Wis. 2d 414, ¶¶30, 36; *see also State v. Gracia*, 2013 WI 15, ¶17, 345 Wis. 2d 488, 826 N.W.2d 87. Here, the evidence presented to the circuit court showed that such a basis existed. That court found that Solberg was dispatched in response to

---

[5] In *State v. Wiskowski*, 2024 WI 23, 412 Wis. 2d 185, 7 N.W.3d 474, our supreme court observed that several justices of the United States Supreme Court have recently "raised questions about community caretaking as a separate doctrinal category" of warrantless seizures. *Id.*, ¶17 n.6 (citing *Caniglia v. Strom*, 593 U.S. 194 (2021)). However, the *Wiskowski* court declined to "alter or modify" its community caretaker precedent. *Wiskowski*, 2024 WI 23, ¶17. This court therefore applies that precedent to the facts presented in this case.

a neighbor's report of "a possible domestic-related incident and a hit and run where subjects who were involved [were] seen fleeing the scene." Shortly thereafter, Solberg spotted a vehicle of the same color, make, and model as one that had reportedly driven away from the scene traveling in the same direction and on the same street as the dispatcher had reported. The court also accepted Solberg's testimony that his primary goal in stopping the vehicle was to check on the well-being of its occupants.

¶23 In addition to these findings, the evidence presented to the circuit court showed that Solberg had also been informed that a child was in one of the vehicles that had driven away from the scene and that someone involved in the incident may have made a threat involving a gun. These facts provide additional support for the conclusion that Solberg had an objective basis to believe that the purple Honda Pilot he encountered was one of the vehicles that had left the scene and that someone in that vehicle, including possibly a child, could have been injured and in need of medical attention.

¶24 Reichert's arguments to the contrary are not persuasive. First, she emphasizes certain facts that could arguably support a contrary conclusion, including that "Solberg did not note any traffic violations or observe any obvious damage to the vehicle." She also notes that Solberg did not know the identity of the Pilot's owner or how many people were in the vehicle when he stopped it. Even if true, these facts are not sufficient to show error by the circuit court. The community caretaker function analysis considers *all* of the relevant circumstances; those that might have suggested that no one in the vehicle needed assistance cannot be considered in isolation and without also considering the circumstances discussed above that support the opposite conclusion.

¶25 Reichert also asserts that although the information Solberg received could give him reason to think "that the woman involved in the altercation might be in need of assistance," he lacked a sufficient basis to believe that woman was in the particular purple Honda Pilot he stopped. Again, this court disagrees. As Solberg drove towards Reichert's residence, he learned that a purple Honda Pilot and the other vehicle that had left the scene had been seen traveling southbound on North University Avenue. Shortly after receiving this information, Solberg observed a purple Honda Pilot traveling in that direction on that street. He spotted the vehicle at night in an area where, in his words, "[t]here was very little to almost no traffic." These facts provided a sufficient basis for Solberg to believe that the vehicle he encountered was one of the vehicles the dispatcher had described.

¶26 Finally, Reichert argues that the stop cannot be characterized as bona fide community caretaker activity because it was not "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Brooks*, 392 Wis. 2d 402, ¶13 (citation omitted). Here, she relies on Solberg's testimony that he stopped her vehicle in part because he was investigating possible criminal activity by the individuals involved in the altercation.

¶27 This argument is not supported by Wisconsin law. The "totally divorced" language quoted in *Brooks* originated in the United States Supreme Court's description of the community caretaker function in *Cady v. Dombrowski*:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or

acquisition of evidence relating to the violation of a criminal statute.

413 U.S. 433, 441 (1973). The Wisconsin Supreme Court has rejected the argument that this language "mean[s] that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function." *Kramer*, 315 Wis. 2d 414, ¶30. Instead, our supreme court has recognized that "[o]fficers may base their actions simultaneously on law enforcement and community caretaker functions." *Blatterman*, 362 Wis. 2d 138, ¶47. Thus, any "subjective law enforcement concerns" Solberg harbored at the time he stopped Reichert's vehicle do not negate or undermine the objectively reasonable basis for the community caretaker function. *See id.*, ¶44 (quoting *Kramer*, 315 Wis. 2d 414, ¶30).

## B. Balance of Interests

¶28 The third element of the community caretaker analysis requires a balancing of "the 'public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen.'" *Wiskowski*, 2024 WI 23, ¶20 (quoting *Kramer*, 315 Wis. 2d 414, ¶40). In conducting this balancing, this court considers the following factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Kramer*, 315 Wis. 2d 414, ¶41 (citation omitted). "The central question" this balancing analysis is intended to answer is whether "the police intrusion aimed at

assisting a member of the public in need [was] reasonable under the circumstances[.]" *Wiskowski*, 2024 WI 23, ¶20.

¶29    Reichert does not make any argument regarding how this balancing analysis shakes out in this case, but this court agrees with the State that the factors weigh in favor of a conclusion that the stop was a valid community caretaker activity. As to the first factor, "[a]n individual's physical and mental health status is an issue of public interest and presents an exigency when an officer reasonably determines that physical or mental health could be in jeopardy." *Blatterman*, 362 Wis. 2d 138, ¶49. As explained above, the reports Solberg received from the dispatcher before he stopped Reichert's vehicle gave him reason to believe that someone in her vehicle could have been physically injured and in need of medical attention. Thus, this factor weighs in favor of a conclusion that the stop was reasonable.

¶30    The second factor considers the circumstances surrounding the seizure. Here, Solberg encountered Reichert's vehicle after being dispatched to her residence in response to a report from a neighbor about a domestic disturbance and potential hit-and-run. Thus, Solberg did not control the time or location of the seizure. *See id.*, ¶53. Though Solberg displayed authority and force when he stopped Reichert, the degree was not excessive given the circumstances. Solberg did not draw his service weapon or begin his interaction with Reichert by ordering her out of her vehicle. He asked if she had just been in an altercation with her boyfriend and asked her to step out of her vehicle after she responded in the affirmative. Solberg asked Reichert and her children if they were okay before he began questioning her about the altercation, and although their conversation occurred out of the view of the squad car video camera, there is no indication that Reichert was physically restrained in any way during the conversation.

¶31  Next, the third factor is whether the seizure involved an automobile. This is relevant because individuals have a diminished expectation of privacy while in an automobile and because a person operating an automobile while in need of medical attention may present a risk of harm to others. *See id.*, ¶56. Here, because Reichert was seized while in her vehicle, this factor weighs in favor of the conclusion that Solberg "reasonably performed a community caretaker function." *See id.*

¶32  The fourth and final factor to consider is "the feasibility and availability of alternatives" to stopping Reichert's vehicle. *See Kramer*, 315 Wis. 2d 414, ¶45. Here, the safest and most effective means available to Solberg of determining whether the purple Honda Pilot had been driven away from the scene of the altercation, and whether anyone in the vehicle needed medical attention, was to effect a brief stop of the vehicle. Reichert does not identify a more feasible alternative that could have accomplished these goals.

¶33  Accordingly, this court concludes that the initial stop of Reichert's vehicle was justified as a permissible community caretaker activity.

## II.     The First Extension

¶34  Reichert next challenges Solberg's extension of the stop beyond the point at which he determined that no one in Reichert's vehicle was in need of assistance. At that point, she contends, any community caretaker justification for the stop ended and Solberg's continued detention of her violated the Fourth Amendment. This court disagrees.

¶35  A traffic stop is a temporary seizure that must "last no longer than is necessary to effectuate the purpose of the stop." *Blatterman*, 362 Wis. 2d 138,

¶20 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Here, the record supports Reichert's contention that the justification for a community caretaker stop evaporated rather quickly. At the suppression hearing, Solberg acknowledged that he was able to determine that none of the occupants in the Honda Pilot needed medical assistance within "a couple minutes" after making the stop. At that point, his community caretaker concern dissipated and the justification for Reichert's detention ended "provided no other independent reason exist[ed] to detain" her. *See Wiskowski*, 2024 WI 23, ¶24.

¶36 Reichert contends that no other independent reason existed to continue the stop. Specifically, she argues that at the point Solberg determined that the occupants of the vehicle were not injured and did not need assistance, he lacked reasonable suspicion that Reichert was driving while intoxicated. Even if Reichert is correct that Solberg was not aware of sufficient facts at that point to reasonably suspect Reichert of driving while intoxicated, the record shows that Solberg *did* have reasonable suspicion that Reichert may have committed a crime during the altercation with her boyfriend. Accordingly, the first extension of the stop to question Reichert about that incident was constitutional.

¶37 It is well-established that a police officer may temporarily detain an individual to investigate possible criminal behavior if the officer has reasonable suspicion that a crime has been committed. *See State v. Houghton*, 2015 WI 79, ¶5, 364 Wis. 2d 234, 868 N.W.2d 143; *State v. Rose*, 2018 WI App 5, ¶14, 379 Wis. 2d 664, 907 N.W.2d 463 (2017). Reasonable suspicion requires that the officer have more than just an "inchoate and unparticularized suspicion or 'hunch'"; rather, the officer must have specific and articulable facts which, taken together with rational inferences from those facts, warrant a reasonable belief that the individual has committed, is committing, or is about to commit an offense.

*State v. Post*, 2007 WI 60, ¶¶10, 13, 301 Wis. 2d 1, 733 N.W.2d 634 (citation omitted). In assessing reasonable suspicion, this court also considers what a reasonable officer would have reasonably suspected given his or her training and experience. *State v. Waldner*, 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996). This court must look at the totality of the circumstances, and as facts accumulate, reasonable inferences about their cumulative effect can be drawn. *Id*. at 58.

¶38 Here, Solberg had more than a hunch that Reichert had been involved in criminal activity. Before he stopped Reichert's vehicle, Solberg learned from the dispatcher that a neighbor had reported a loud argument between a male and a female outside Reichert's residence that ended with the participants driving away in separate vehicles. The dispatcher also reported that the vehicles may have collided as they left the scene. In addition, Solberg testified that he learned that "some type of a threat of a gun [was] involved." Finally, Reichert confirmed that she had been in an altercation with her boyfriend before Solberg ascertained that she and her children were not injured.

¶39 Considering these facts, all of which were known to Solberg *before* his community caretaker concerns dissipated, an officer would have reason to suspect that Reichert may have violated the criminal law during the altercation with her boyfriend or by making contact with his car and then driving away. Therefore, Solberg was justified in continuing to detain Reichert in order to obtain further information from her about what had happened during the altercation and whether a hit-and-run had occurred.

### III. The Second Extension

¶40 Lastly, Reichert argues that Solberg impermissibly extended the stop at the end of his conversation with her about the altercation to perform field

16

sobriety tests. She contends that this second extension was not supported by reasonable suspicion.

¶41 As a general matter, an extension of a traffic stop to investigate possible violations of criminal law other than those that prompted the stop is lawful provided reasonable suspicion of additional criminal behavior exists:

> If, during a valid traffic stop, the officer becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense or offenses separate and distinct from the acts that prompted the officer's intervention in the first place, the stop may be extended and a new investigation begun. The validity of the extension is tested in the same manner, and under the same criteria, as the initial stop.

*State v. Colstad*, 2003 WI App 25, ¶19, 260 Wis. 2d 406, 659 N.W.2d 394 (quoting *State v. Betow*, 226 Wis. 2d 90, 94-95, 593 N.W.2d 499 (Ct. App. 1999)). Applying this general principle to the specific context presented here—an extension to perform field sobriety tests—our supreme court has explained that such extensions are permissible if an officer has reasonable suspicion that a motorist has committed an offense "the investigation of which would be furthered" by the tests. *State v. Hogan*, 2015 WI 76, ¶37, 364 Wis. 2d 167, 868 N.W.2d 124.

¶42 Reichert contends that Solberg lacked reasonable suspicion that she was impaired when he "concluded his community caretaker function," but that is not the proper point at which to ground the reasonable suspicion analysis. Rather, this court must assess reasonable suspicion at the time Solberg extended the stop to perform the tests. In its ruling, the circuit court identified four facts known to Solberg at that point in time that, in its view, provided reasonable suspicion to administer the tests. First, Solberg knew that Reichert had been driving. Second,

17

having spoken to Reichert for approximately twenty minutes, Solberg perceived her speech to be "thick and slow." Third, Reichert had admitted to drinking alcohol at dinner that evening. And finally, just before he decided to administer the tests, Solberg learned from the officer who was speaking with Reichert's boyfriend that the boyfriend had been concerned that she was impaired as she prepared to leave with her children. This court agrees with the circuit court that these facts provided reasonable suspicion that Reichert had been driving while impaired and thus justified Solberg's decision to administer field sobriety tests.

¶43 Reichert criticizes what she describes as the circuit court's overreliance on "the self-serving reporting of [her] boyfriend," suggesting that the reliability of the report was compromised because it was provided by "the reported aggressor attempting to prevent Ms. Reichert from leaving with her children." It is true that the police must consider the reliability and content of a tip before it can justify a seizure. *State v. Rutzinski*, 2001 WI 22, ¶17, 241 Wis. 2d 729, 623 N.W.2d 516. An assessment of reliability considers both the veracity of the tipster and the basis for his or her knowledge. *Id.*, ¶18. Here, the information relayed to Solberg came from a person who had recently observed Reichert and was corroborated by Reichert's admission that she had consumed multiple drinks at dinner that evening and her "thick and slow" speech. This court sees no error in the circuit court's consideration of the boyfriend's reported concern as one of the specific, articulable facts that provided reasonable suspicion to order the field sobriety tests.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.